ROCKLINE, INC., and Rockline, Inc. Health Care Benefit Plan, Plaintiffs-Respondents,

v.

WISCONSIN PYSICIANS SERVICE INSURANCE, Defendant-Appellant,

EMPLOYERS INSURANCE OF WAUSAU and Milwaukee County, Defendants.

Court of Appeals

*No. 92-1540. Submitted on briefs January 26, 1993.—Decided March 31, 1993.*

(Also reported in 499 N.W.2d 292.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Elwin J. Zarwell, Ross R. Kinney* and *Mary Pat Ninneman* of *Quarles & Brady* of Milwaukee.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *Richard P. Carr* and *Dean E. Mabie* of *Reinhart, Boerner, Van Deuren, Norris & Rieselbach, S.C.* of Milwaukee.

Before Nettesheim, P.J., Anderson and Snyder, JJ.

SNYDER, J. Wisconsin Physicians Service Insurance (WPS) appeals from a summary judgment determining that, as claims administrator and excess insurer for Rockline's self-insured employee benefit plan, it was liable for certain bills submitted under the plan after its excess insurance policy and administrative services agreement was terminated by Rockline. WPS contends that under the express terms of the excess insurance policy issued to Rockline, claims under the plan must be paid within the policy period in order to be considered for reimbursement. Because we agree that the plain language of the policy does not provide coverage for any claims not paid within the policy period, we reverse.

## FACTS

The essential facts are undisputed. Rockline maintains its own self-insured health care plan for its employees known as Rockline Inc. Health Care Benefit Plan. From 1985 through 1989, Rockline contracted with WPS to serve as the administrator of the plan. Under the administrative services agreement, WPS was responsible

for processing claims and paying all bills it determined to be eligible under the plan on behalf of Rockline. WPS would then provide Rockline with a summary of payments made under the plan each month, for which Rockline would then reimburse WPS.

In addition, Rockline purchased an aggregate "stop-loss" insurance policy from WPS. Stop-loss insurance is excess insurance designed to protect a self insured plan against unexpectedly large claims and catastrophic health costs for covered employees. Coverage under the stop-loss policy is triggered when the amount paid by Rockline through its self-insured plan exceeds a specified aggregate amount during the policy term. At the end of the policy term, WPS would reimburse Rockline for the entire amount of plan payments made in excess of the stop-loss limit, if any.

The stop-loss policy issued by WPS provided reimbursement for those plan payments "incurred and paid." In other words, WPS agreed to reimburse Rockline for excess plan payments that were incurred after the effective date and paid during the stop-loss policy term. The 1989 policy term was originally to run from January 1, 1989 through December 31, 1989. By letter dated June 30, 1989, Rockline terminated the administrative services agreement and the stop-loss policy effective July 31, 1989.

To assure continuity of claims, however, Rockline requested WPS to process "runout" claims—those claims incurred before the stop-loss policy terminated but not submitted until afterward. Claims incurred after July 31, 1989 were directed to be sent to the successor claims processor, Employers Insurance of Wausau.

Rockline and WPS agreed that WPS would provide such runout services through November 30, 1989.[1]

In July 1989, Wilbert Schultz, a Rockline employee covered under the plan, entered the hospital for treatment of esophageal cancer and remained hospitalized through February 1990. The hospital, surgical and medical charges totaled nearly one-half million dollars. The hospital submitted two bills to WPS for payment—one in December 1989 and another in March 1990. However, WPS did not process or pay these bills pursuant to the administrative services agreement because the runout period had expired on November 30, 1989.

When tabulating the stop-loss settlement for the 1989 policy period, WPS did not include the two Schultz bills, reasoning that they were not "incurred and paid" within the stop-loss policy period. Rockline's plan payments for the 1989 policy period totaled $262,578.78, not including the two Schultz hospital bills. The aggregate stop-loss limit for 1989 was calculated to be. $263,619.72.[2] Therefore, without the Schultz bills the total plan payments made by Rockline did not exceed the stop-loss limit. Accordingly, WPS determined that it

---

[1] The only factual dispute between the parties is whether this runout period included a new stop-loss agreement corresponding with the runout period for administrative services. Rockline maintains that it requested and paid for stop-loss insurance coverage, while WPS maintains that Rockline only requested and contracted for WPS to provide administrative services during the runout period. Both parties agree that there was no written agreement after July 31, 1989 specifying the terms, conditions or handling of stop-loss claims during the runout period.

[2] According to the agreement, the stop-loss limit for the given period was calculated by multiplying the monthly number of employees by the projected claims per employee, then multiplying that product by 125%.

was not liable to reimburse Rockline for any payments made during the 1989 policy period.

Rockline commenced suit against WPS alleging that WPS breached the 1989 stop-loss insurance contract when it failed to pay the two Schultz bills.[3] The trial court granted summary judgment in favor of Rockline in a memorandum decision on March 20, 1992. WPS appeals from that judgment.

## COVERAGE

The interpretation of an insurance policy presents a question of law that may appropriately be decided on summary judgment. *Wagner v. Milwaukee Mut. Ins. Co.*, 145 Wis. 2d 609, 612, 427 N.W.2d 854, 855 (Ct. App. 1988). We will reverse a trial court's granting of summary judgment only if the trial court incorrectly decided a legal issue or if material facts were in dispute. *Id.* In this instance, we need only address the question of law regarding coverage because no material issues of fact are in dispute.[4]

---

[3] Rockline also made claims against Employers Insurance of Wausau, the successor insurer, for alleged misrepresentation, breach of its stop-loss insurance contract, and bad faith refusal to pay the two Schultz bills. The claim against Milwaukee county alleged negligence in failing to submit for payment the two Schultz bills while WPS' stop-loss coverage was in effect. These claims are not at issue in this appeal.

[4] As stated by the trial court:

> Rockline and WPS have identified, outlined and stipulated to the material facts upon which the instant action is founded. In light of this, the court is impelled to conclude that there are no unresolved issues of material fact necessitating trial. Rockline and WPS acknowledge that the outcome of the instant case is wholly dependent on a question of law.

The issue before this court is whether the stop-loss policy issued by WPS provides coverage for claims submitted after Rockline terminated the policy. Since the interpretation of an insurance contract is a question of law, we review the contract independently without deference to the trial court. *Qualman v. Bruckmoser*, 163 Wis. 2d 361, 364, 471 N.W.2d 282, 284 (Ct. App. 1991).

When interpreting an insurance contract, doubts and ambiguity regarding coverage must be resolved in favor of the insured. *Id.* at 365, 471 N.W.2d at 284. However, where policy terms are unambiguous, this court merely applies those terms rather than engaging in any construction. *Wagner*, 145 Wis. 2d at 614, 427 N.W.2d at 856. We conclude that the WPS stop-loss policy is not ambiguous and does not extend to claims submitted after the policy was terminated.

The pertinent language of the stop-loss policy issued to Rockline provides the following:

## 1. DEFINITIONS

*"Accumulation Period"* means the period beginning at 12:01 a.m. on January 1, 1989 and ending at midnight on the earlier of:

a. December 31, 1989; or
b. any date this policy terminates. . ..

*"Plan Payment"* means a health coverage expense for which charges are incurred after the original effective date of the plan and paid during the Accumulation Period on behalf of an eligible employee or eligible dependent according to the terms and conditions of the Policyholder's self-funded health plan. . ..

. . ..

590

### 3. REIMBURSEMENT

. . ..

> If the sum of all Plan Payments made on behalf of a participant during the Accumulation Period exceeds the Aggregate Stop-Loss Limit, WPS will reimburse 100% of the excess to the Policyholder.

The plain language of the stop-loss policy expressly limits coverage to those claims which were *incurred and paid* during the accumulation period. WPS is obligated to reimburse Rockline only when the claims paid by Rockline exceed the stop-loss limit. According to the plain language of the policy, the accumulation period in this case ran from January 1, 1989 through July 31, 1989, the date that Rockline terminated the policy.

Schultz was admitted to the hospital in mid-July 1989, shortly before the effective termination date of July 31, 1989. While the charges associated with his hospital stay were arguably incurred within the policy period,[5] they were not *paid* by Rockline within the policy period. It is undisputed that the bills have not been paid and were not even submitted to WPS until December 1989 and March 1990. Since the two bills were not incurred *and* paid within the stop-loss policy period as required by the plain language of the policy, they cannot be covered.[6] Further, it is undisputed that without the

---

[5] The policy provides that "[c]harges for hospital or other institutional confinements are incurred on the date of admission."

[6] The fact that the Schultz bills "were not, in fact, paid during the period of this policy or . . . any extension of this policy" was significant enough so that Rockline's own expert, Steven Stucky, concluded that "if they weren't paid, then I don't think that this policy should pay."

591

two Schultz bills, the plan payments made by Rockline in 1989 would not exceed the stop-loss limit for the 1989 stop-loss policy period. Accordingly, WPS cannot be held liable for any reimbursement to Rockline under the 1989 stop-loss policy.[7]

The trial court found that the policy was ambiguous. The court expanded the coverage of the policy to include the two Schultz bills because: (1) language in the policy suggests that coverage continues until the actual date of settlement; and (2) the stop-loss policy incorporates all the provisions of the plan, which provides an extended period of time for filing claims. We conclude that these findings are erroneous and inconsistent with the plain language of the policy.

First, the trial court expanded the coverage provided by the stop-loss policy when it found that the policy was ambiguous. The trial court focused on the following provision:

### 3. REIMBURSEMENT

Approximately 60 days following the termination date of this agreement plus any claims runout period, if applicable, WPS will tabulate a Stop-Loss Settlement.

. . ..

Any claims for dates of service incurred before the policy termination date, but not paid at the time of

---

[7] The parties dispute whether or not the runout period which terminated November 30, 1989 included additional stop-loss coverage. However, this factual dispute is not material to our decision. Even assuming Rockline's position to be true, that the stop-loss coverage continued through November 30, 1989, the policy would not provide coverage because the two Schultz bills were submitted after the runout period and were therefore not paid by WPS.

settlement, will not be eligible for reimbursement under this agreement.

The court held that such language was inconsistent with the previous language and signifies that the policy contemplates reimbursement for claims incurred before termination of the policy but paid prior to the date of settlement. Since WPS did not submit the settlement tabulation to Rockline until July 19, 1990, the court held that "[b]ecause the bills were submitted to WPS for payment prior to final settlement . . . WPS is liable for the *payment* of the bills." (Emphasis added.)

The trial court's finding of ambiguity and extension of coverage in this manner is erroneous based on a reading of the policy as a whole. The very essence of stop-loss insurance is to *reimburse* the self-insured for payments it makes above the predetermined stop-loss limit. The WPS stop-loss policy repeatedly refers to reimbursement for plan payments made within the policy period. In this case, the two Schultz bills at issue were not paid before the policy or runout period terminated and have not been paid to this date. As a result, they cannot be considered for reimbursement.

Nowhere in the policy is there coverage language supporting the trial court's interpretation that the mere submission of the bills to the insurer by the date of settlement, but not paid, is sufficient to trigger the reimbursement obligation. Such a reading of the policy renders the majority of the stop-loss policy language meaningless. A construction must be avoided which renders portions of the contract meaningless, inexplicable or mere surplusage. *Goebel v. First Fed. Sav. & Loan Ass'n of Racine,* 83 Wis. 2d 668, 680, 266 N.W.2d 352, 358 (1978).

The trial court's interpretation confuses WPS' obligations under the administrative services agreement and its liability under the stop-loss policy. The only instance in which WPS would be responsible for the *payment* of bills, as opposed to *reimbursement*, would be in its capacity as administrator of the plan, where WPS pays the bills and is reimbursed monthly by Rockline. However, Rockline terminated the administrative services agreement and replaced it with the 120-day runout period ending November 30, 1989. Since the Schultz bills were submitted for payment after the runout period expired, WPS had no contractual duty to process or pay those bills.

Rockline apparently calculated that the runout agreement would provide it with adequate coverage before a new administrator took control. By terminating the agreement, Rockline miscalculated and created a gap in coverage. Therefore, it was Rockline's decision acting as a self-insurer, not WPS' insurance policy, which created the gap. We decline to impose Rockline's mistake on WPS. To find otherwise is to commit WPS to a unilateral obligation to cover excess expenses without any consideration. No contract of insurance should be rewritten by construction to bind an insurer to a risk which it did not contemplate and for which it was not paid. *Paape v. Northern Assurance Co. of America*, 142 Wis. 2d 45, 51, 416 N.W.2d 665, 668 (Ct. App. 1987).

The trial court also determined that the stop-loss policy incorporated by reference all the provisions of Rockline's health care plan and that the plan itself expands the stop-loss coverage. Section 13.4 of the plan declares:

*Unless otherwise specified*, all claims for reimbursement must be submitted within 120 days of the date of the expense. . ... Late claims may not be reimbursed unless the employee demonstrates to the Claim Administrator that it was not reasonably possible to submit proof of the claim within the prescribed 120 day period. In no event will a claim be accepted beyond one year plus 120 days from the date of expense. [Emphasis added.]

Therefore, the trial court concluded that the Schultz bills were submitted within the time frame allotted under this provision and should be included in the stop-loss settlement.

██ The trial court again failed to consider the significance of the fact that Rockline terminated the policy. The trial court correctly noted that "without considering the ramifications of its decision to discontinue its stop-loss insurance or exploring potential consequences, Rockline proposed to WPS that a 120 day 'run-out' period for processing of claims be established." Contrary to the trial court's conclusion, this runout period constitutes an "otherwise specified" agreement which supercedes the prior agreements.[8]

## STATUTE AND PUBLIC POLICY

As an alternate ground for upholding coverage for the Schultz claims, the trial court concluded that the

---

[8] The trial court concluded that "[n]owhere is there a whit, scrap, or shred of evidence to suggest that Rockline and WPS *mutually assented* to have the parol agreement supplant the express settlement and reimbursement provisions of the original stop-loss insurance policy." (Emphasis added.) However, our review of the record indicates that both parties clearly intended that November 30, 1989 would be the end of their relationship.

stop-loss policy violated sec. 631.81, Stats.[9] The court stated:

> The stop-loss policy does not require that claims be submitted within such time to permit WPS to adjust, settle and pay the claims prior to the termination of the policy. Clearly, such policy violates the dictates of 631.81(1), stats., which provides coverage for claims incurred within one year following the time required by the policy provided the insurer is not prejudiced thereby.

The court reasoned that since the Schultz bills were submitted to WPS as soon as practical and within one year of the time required, and WPS was not prejudiced, the stop-loss policy must cover the bills. We disagree.

We conclude that sec. 631.81(1), Stats., is inapplicable in this case. The stop-loss policy in question is an excess insurance policy, not a primary insurance policy. The "incurred and paid" provision establishes the essential terms for reimbursement and declares what claims are covered. The stop-loss policy does not require Rockline to submit a notice and proof of loss in order to secure reimbursement. Rather, such requirements apply to the plan and administrative services agreement, which Rockline explicitly canceled.[10] If we allowed an

---

[9] Section 631.81(1), Stats., states:

Provided notice or proof of loss is furnished as soon as reasonably possible and within one year after the time it was required by the policy, failure to furnish such notice or proof within the time required by the policy does not invalidate or reduce a claim unless the insured is prejudiced thereby and it was reasonably possible to meet the time limit.

[10] In any event, the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*, likely preempts sec. 631.81, Stats., to the extent that sec. 631.81 relates to the plan and/or adminis-

extended reporting time after the end of the stop-loss policy, we would be extending coverage to the insured without consideration. We decline to do so.

The trial court also held that the incurred and paid provision of the stop-loss policy is void as against public policy. The trial court reasoned that such a provision places WPS "in the position of being able to control what claims would qualify for reimbursement by simply acting with a lack of celerity when the attachment point is neared." Therefore, the court concluded that a conflict of interest existed contrary to public policy because once the attachment point is approached or exceeded, it is to the detriment of WPS to pay the claims at that point. We disagree.

We conclude that the incurred and paid provision of WPS' stop-loss policy is not contrary to public policy for the following reasons. First, the trial court failed to recognize that Rockline was first and foremost a self-insurer by choice. Rockline contracted with WPS to be the administrator of its self-funded plan and to provide stop-loss insurance. Although no doubt convenient, there is no evidence indicating that Rockline was required to have WPS or any other insurer serve as both the administrator of its plan and provider of stop-loss insurance. To the extent that any conflict exists, Rockline is responsible for choosing it.

Second, the administrative services agreement requires that WPS "[t]ake all reasonable steps to process

tration of the plan. *See FMC Corp. v. Holliday*, 498 U.S. 52, 61 (1990) (ERISA "deemer clause" preempts state statutes that regulate self-funded employee benefit plans). The fact that Rockline's plan is not fully funded, having contracted for stop-loss coverage with WPS, is not enough to escape ERISA preemption. *See General Split Corp. v. Mitchell*, 523 F. Supp. 427 (E.D. Wis. 1981).

claims and disburse claim payments expeditiously."
There is no evidence that the conflict of interest outlined
by the trial court—that WPS could intentionally delay
processing and paying bills—ever developed in this case.
The two Schultz bills were submitted *after* the runout
period had ended, not within the last week of the runout
period. Contrary to Rockline's assertions, the fact that
WPS was aware of the Schultz hospitalization does not
create a duty under the administrative services agree-
ment to pay the claim. It would be unreasonable to
require WPS to actively search out claims to make sure
that they are submitted before the end of the policy
period.

Furthermore, Rockline's position ignores the fact
that it was also aware of the Schultz claims. As the trial
court stated, "What is truly amazing is that knowing of
Mr. Schultz' gigantic health care claims, Rockline can-
celed its administrative services agreement and aggre-
gate stop-loss insurance with WPS." We decline to
impose the adverse consequences of Rockline's decision
on WPS.

Third, even if an insurer with an incurred and paid
provision would intentionally neglect to pay certain bills
submitted shortly before the policy ended, the insured
would not be without remedy. For example, given the
policy language in this case, the insured would be able to
maintain a breach of contract action against an insurer
who fails to process and disburse claims "expeditiously."
Further, the self-insured can always prevent such con-
flicts by negotiating a more favorable arrangement from
the beginning for a greater premium.

Because there are no material issues of disputed fact
and the stop-loss policy unambiguously does not provide
coverage for the Schultz bills and does not contravene

any statute or public policy, we reverse and direct the trial court to enter summary judgment in favor of WPS.[11]

*By the Court.*—Judgment reversed and cause remanded with directions.

---

[11] Although the record indicates that WPS did not move for summary judgment with respect to the issue on appeal in this case, its brief in opposition to Rockline's motion for summary judgment concluded that the evidence "compel[s] a ruling in WPS's favor as a matter of law." In reviewing summary judgments, we apply the methodology set forth in sec. 802.08(2), Stats., in the same manner as the trial court and conduct our review *de novo. Schapiro v. Security Sav. & Loan Ass'n*, 149 Wis. 2d 176, 181, 441 N.W.2d 241, 244 (Ct. App. 1989). Because the material facts are undisputed in this case and we conclude that WPS is entitled to judgment as a matter of law, summary judgment is appropriate. *Id.*