**ZENITH INSURANCE CO.,
Plaintiff–Appellee,**

v.

**EMPLOYERS INSURANCE OF WAUSAU, Defendant–Appellant.**

No. 96–3589.

United States Court of Appeals, Seventh Circuit.

Argued April 8, 1997.

Decided March 27, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied May 14, 1998.

James I. Rubin, Mary A. Martin (argued), Louis J. Aurichio, Butler, Rubin, Saltarelli & Boyd, Chicago, IL, Kenneth R. Nowakowski, Whyte, Hirschboeck & Dudek, Milwaukee, WI, for Plaintiff–Appellee.

Mark A. McClendon, Timothy F. Mentkowski (argued), Crivello, Carlson, Mentkowski & Steeves, Milwaukee, WI, for Defendant–Appellant.

Before EASTERBROOK, KANNE, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

This case is about information: information that does, or should, flow from a primary insurance company to a reinsurer. Employers Insurance of Wausau ("Wausau") issued an "umbrella" Commercial General Liability ("CGL") insurance policy to one of its clients, and it then reinsured part of its exposure under that policy with Zenith Insurance Company ("Zenith"). When the client enlisted Wausau to defend against a tort action, Wausau handled matters on its own, not notifying Zenith even of the existence of the case until after the jury had returned a whopping verdict against the client. Zenith thought that was too late, denied coverage under the reinsurance policy, and sued for a declaratory judgment in its favor. The district court agreed with Zenith and entered the requested judgment, rejecting Wausau's counterclaim in the process. Wausau now appeals. We conclude that the district court correctly concluded that under the governing Wisconsin law Wausau's notice was late, but that further proceedings are necessary to determine whether Zenith was prejudiced by the delay.

**I**

In 1989, Wausau issued two insurance policies to its client, Standard Motor Products, Inc. ("Standard"), an automotive parts distributor. The first policy was a primary policy insuring Standard against commercial liability up to $1 million, and the second was the umbrella policy at issue here, insuring Standard for an additional $20 million. Each policy took effect on January 1, 1990.

To protect itself, Wausau reinsured the umbrella policy—that is, it insured its own risk that Standard would call on it to pay some or all of the $20 million—with a variety of other insurance companies. One such company was Zenith, which agreed to insure Wausau for 50% of the first $1 million Wausau had to pay under the umbrella policy. This meant that, if Standard were found liable for $2 million in damages covered by its CGL policy, Wausau would pay the first $1 million under the primary policy, and Wausau and Zenith would each pay $500,000 under the umbrella policy (assuming no par-

ticipation by any of the other reinsurers). The reinsurance policy took the form of "facultative" reinsurance, rather than "treaty" reinsurance. In other words, Zenith agreed only to provide reinsurance on Wausau's specific umbrella policy with Standard. If it had been treaty reinsurance, Zenith's policy would have covered an entire class of policies issued by Wausau. See Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d § 9:3.

The agreement between Wausau and Zenith was memorialized in a "Facultative Reinsurance Certificate." Part V of that certificate is the focus of the current dispute:

> V. Claims. The Reinsured [Wausau] agrees that it will investigate and will settle or defend all claims arising under the primary policy and that it will give prompt notice to the Company [Zenith] of any event or development which, in the judgment of the Reinsured, might result in a claim upon the Company hereunder, and will forward promptly to the Company copies of such pleadings and reports of investigation as may be requested by the Company.
>
> The Company shall have the right, at its own expense, to participate jointly with the Reinsured in the investigation, adjustment or defense of claims to which, in the judgment of the Company, it is or might become exposed.
>
> The Company shall reimburse the Reinsured or its legal representative promptly for loss against which indemnity is herein provided, upon receipt in the home office of the Company of satisfactory evidence of payment of such loss.

The policy was to be in force through January 1, 1991.

The events giving rise to this suit were set in motion when Standard, through its Champ Service division, sold some lug nuts to a mechanic who used them to install a wheel on 19–year–old Edward Smith's car. On May 8, 1990, the wheel fell off the car while Smith was driving it on Interstate Highway 79 in West Virginia. The injuries Smith suffered left him a paraplegic. He sued a number of defendants, including Standard, claiming al-

ternatively that the accident was caused by defective lug nuts and washers that caused the wheel to fall off, and that the various defendants had failed to provide adequate warnings about the use of the washers and lug nuts on the type of wheel he had on his car.

Wausau received notice of the claim from Standard on March 14, 1991. At that time, Wausau opened a claim file under its $1 million primary policy, but it did not open a file under the umbrella policy. Wausau did notify its treaty reinsurers of the claim, because it recognized that the seriousness of Smith's injuries gave his claim a potential settlement value of $2 million to $3 million. It did not, however, notify any facultative reinsurers, because its policy was to send those notifications when it opened its own umbrella policy file.

Once it knew about Smith's lawsuit, Wausau began its own internal investigation. It retained attorney Thomas Hurney to represent Standard's Champ Service division and it prepared an analysis of the suit, which was reflected in a May 17, 1991, memorandum. In that memo, Don Warren, Wausau's Home Office Liability Claim Manager, expressed the opinion that liability was "questionable," and that "the potential settlement value of this case could be in the range of $2,000,-000—$3,000,000." Wausau Appendix at 1065. In response to Warren's report, Wausau gradually increased its funds on reserve for the litigation from a low of $50,000, to $250,-000 (May 1991), up to $500,000 (end of 1991).

As the trial approached, Hurney became more concerned about the outcome of the case. On several occasions, he notified Wausau that everything depended on whom the jury would believe, Wausau's experts (who said the accident occurred because Smith was driving too fast, and the wheel did not fly off until the car hit the guardrail) or Smith's eyewitness Craig Milgram (who said that he saw the wheel come off before Smith's car began to swerve). In April 1992, still before the trial, Hurney estimated the total potential damages as falling between $2 million and $5 million and he noted that only three defendants (including Champ Service) remained in the case at that point. Smith's

lawyers, for their part, had decreased their settlement demands from all defendants from $5 million to $3.4 million. Smith offered around that time to settle with Champ Service for $2 million, but Hurney did not have authority to go that high. Believing that Smith's lawyers would accept less, Hurney asked Wausau to grant him the authority to settle for between $750,000 and $1.5 million.

Wausau thought Hurney was being too generous. In response to his request, it granted him the authority to make a settlement offer of up to $750,000. Hurney offered $635,000 on May 27, 1992, just before the trial, but Smith's lawyers stuck to their final counteroffer of $1.5 million. Meanwhile, Champ Service was slowly being isolated as the lone remaining defendant, which it was by the time of trial.

The trial began on June 3, 1992. A series of email messages from Hurney to Wausau reflected his growing concern about the jury's likely verdict. By June 8, counsel had reported to Wausau that "his read of the jury is that their [sic] just not going to allow the plaintiff to leave the court room without any money," and "since [Champ is] the only [defendant] left, he believes that we will pay no matter how good of a case he put [sic] on. He places the potential verdict at between 4 and 6 million." Zenith Appendix at 162. That prompted Wausau to move its settlement offer up to $900,000, but Smith's lawyers obviously also realized that things were going well for them, and they held firm at $1.5 million. Their persistence was richly rewarded. The case was submitted to the jury, which on June 12 returned a verdict for Smith in the amount of $8,969,671, all of which Champ Service had to pay as the last remaining defendant (with small offsets reflecting the earlier settlements).

Only then, on June 17, did Wausau open a claim under Standard's umbrella policy, and it still did not notify its facultative reinsurers. Not until August 26, after all of its post-trial motions were denied, did it begin that process. Notice did not wend its way to Zenith until approximately September 17, 1992, at which point Wausau's only hope of staying within the primary policy limits was the prospect of prevailing on appeal from the jury's

verdict. Wausau eventually settled the claim with Smith for $7 million. It included in its September 17 notice to Zenith, however, a demand for the full $500,000 available under the reinsurance policy, representing half of the second million due to Smith.

Zenith refused to pay, claiming that Wausau had breached its contractual duty under the policy to provide "prompt" notice of possible claims. It followed up with this diversity action in federal court, seeking a declaration that it was not liable to Wausau because (1) Wausau had breached its contractual duty to provide notice, and (2) Wausau had breached its fiduciary duty and duty of utmost good faith and fair dealing. Wausau counterclaimed for the $500,000 it asserted was owing under the policy. In a preliminary ruling from which no one has appealed, the district court dismissed Zenith's claim based on breach of fiduciary duty. It granted summary judgment for Zenith on the breach of contract and breach of a duty of utmost good faith and fair dealing counts, and on Wausau's counterclaim.

## II

Although both parties agreed that Wisconsin law governs the policies in question, neither they nor the district court confined their consideration to that state's law. Wisconsin courts have not spoken directly to the question before us, and the district court implicitly assumed that, in the absence of controlling authority from the Wisconsin Supreme Court, it should look to the Second Circuit's decision in *Unigard Sec. Ins. Co. v. North River Ins. Co.*, 4 F.3d 1049 (2d Cir.1993), which construes New York law. In our view, both the parties and the lower court moved too hastily to New York law, as the Second Circuit understands it, and did not fully take into account the information we do have about the way Wisconsin handles insurance contracts. Our responsibility is to extrapolate from existing statements of Wisconsin law how we think those courts would resolve the questions the parties have raised and to consider law from other jurisdictions only insofar as we believe they are consistent with these principles of Wisconsin law. See

*Brooks v. Chicago Downs Ass'n*, 791 F.2d 512, 514 (7th Cir.1986).

■ Reviewing the district court's summary judgment rulings *de novo*, see *Mendrala v. Crown Mortgage Co.*, 955 F.2d 1132, 1139 (7th Cir.1992), we begin with Zenith's claim that Wausau breached the reinsurance contract by failing to give Zenith prompt notice of the Smith litigation. Under Wisconsin law, "[c]ontracts of insurance are controlled by the same principles of law that are applicable to other contracts." *Garriguenc v. Love*, 67 Wis.2d 130, 226 N.W.2d 414, 417 (1975). " 'A court may not depart from the plain meaning of a contract where it is free from ambiguity.' " *Algrem v. Nowlan*, 37 Wis.2d 70, 154 N.W.2d 217, 221 (1967), quoting *Cernohorsky v. Northern Liquid Gas Co.*, 268 Wis. 586, 68 N.W.2d 429, 433 (1955). In cases dealing with primary insurance contracts and insured parties, Wisconsin follows the common rule that ambiguities in the contract are to be construed in favor of the insured party. See, *e.g.*, *Gerrard Realty Corp. v. American States Ins. Co.*, 89 Wis.2d 130, 277 N.W.2d 863, 868–69 (1979). See also *Goebel v. First Federal Savings & Loan Ass'n*, 83 Wis.2d 668, 266 N.W.2d 352, 356 (1978) (noting that Wisconsin's rule for construing ambiguities against the drafter "has particular force where ... there is a substantial disparity of bargaining power between the parties").

■ The initial question we must answer is whether Wisconsin would apply these general principles to reinsurance contracts, or if, on the contrary, it would adopt the Second Circuit's approach of looking at such contracts "pursuant to a principle of neutral interpretation." See *Unigard*, 4 F.3d at 1065, citing *Unigard Sec. Ins. Co. v. North River Ins. Co.*, 79 N.Y.2d 576, 584 N.Y.S.2d 290, 294, 594 N.E.2d 571, 575 (1992). Almost fifty years ago, this court, contrary to the view adopted by the Second Circuit in *Unigard*, concluded that under Wisconsin law courts must construe ambiguities in reinsurance contracts in favor of the reinsured. *Employers Mutual Liability Ins. Co. v. Underwriters at Lloyd's*, 177 F.2d 249, 252 (7th Cir.1949), *aff'g* 80 F.Supp. 353, 355 (W.D.Wis. 1948). We can find nothing in Wisconsin law

that indicates Wisconsin courts believe that we had misstated the law in *Employers Mutual* or that they are prepared to abandon the seldom-cited but not rejected rule upheld in *Employers Mutual.* The Wisconsin Supreme Court commented in one case in which it was interpreting an earlier version of the Wisconsin insurance laws in a reinsurance dispute that "it is the position of the state that insurance companies, dealing at arms' length, will be held to their contractual obligations," but this statement tells us nothing about what those obligations are. See *Ott v. All–Star Ins. Corp.*, 99 Wis.2d 635, 299 N.W.2d 839, 849 (1981). Other Wisconsin cases dealing with disputes between insurance companies and reinsurers have not taken a stand on the applicability of the ambiguity rule. See, *e.g., Franklin Mutual Ins. Co. v. Meeme Town Mutual Fire Ins. Co.*, 68 Wis.2d 179, 228 N.W.2d 165, 167–68 (1975); *Rockline Inc. v. Wisconsin Physicians Servs. Inc.*, 175 Wis.2d 583, 499 N.W.2d 292, 295 (App.1993).

In our view, this leaves us with *Employers Mutual.* From a policy standpoint, some of the interests protected by the general rule that insurers bear the brunt of contractual ambiguities are just as applicable to reinsurance cases, and others are not. For example, one important reason why Wisconsin courts construe insurance contracts in favor of the insured party relates to that party's reasonable reliance interests. That interest is similar whether one is speaking of a primary policy and the beneficiary or a reinsurance policy and a primary insurer. See, *e.g., Employers Mutual*, 177 F.2d at 252. Furthermore, even though the Second Circuit's *Unigard* opinion relies on the fact that "reinsurance contracts are negotiated at arm's length by two sophisticated parties," 4 F.3d at 1065, it is also true that many primary CGL policies fit the same description. We would need more recent evidence from Wisconsin contradicting *Employers Mutual* to justify a carve-out that would free reinsurance policies from Wisconsin's general rules of interpretation for insurance policies. Finding no such evidence, we apply Wisconsin's general principles to the problem before us.

The central question for both Zenith's breach of contract claim and its breach of the duty of "utmost" good faith claim—at what moment did Wausau's obligation to notify Zenith of the Smith case accrue—requires us to interpret part V of the reinsurance agreement, quoted above. Zenith stresses the fact that part V requires the Reinsured, Wausau, to "give *prompt* notice to the Company" of anything that *"might* result in a claim." (Emphasis added.) This language, it argues, implies an objective standard for the timeliness of notice and for the type of event that should trigger notice. Wausau, for its part, focuses on the language that falls between the two phrases Zenith emphasizes. The "prompt" notice to Zenith must be "of any event or development which, *in the judgment of the Reinsured,* might result in a claim." (Emphasis added.) Because there is no qualifying phrase attached to the language Wausau emphasizes, it argues that the contract provides for a completely subjective test: notice is required only when Wausau, in the unfettered exercise of its own judgment, thinks notice should be given.

The Wisconsin Supreme Court has discussed similar contractual language requiring prompt notice of possible claims, in slightly different insurance contexts. The first such case was *RTE Corp. v. Maryland Cas. Co.*, 74 Wis.2d 614, 247 N.W.2d 171 (1976). There the court first noted that it had earlier interpreted a clause calling for "immediate notice" to require notice "to be given in such time as is 'reasonably requisite,' or 'reasonably necessary under the circumstances to do the thing required.'" *Id.*, 247 N.W.2d at 177–78 (citations omitted). Finding little difference between the terms "immediate" and "promptly," the court held in *RTE Corp.* that "[t]he words 'immediately,' 'forthwith,' 'promptly,' 'as soon as practicable' all require notice in 'a reasonable time.'" *Id.* at 178 (internal quotations and citations omitted). See also *Gerrard*, 277 N.W.2d at 870 (quoting *RTE Corp.*).

■ It is true that the language of this policy requires us to reconcile the objective meaning of the word "promptly" in part V with the apparently subjective reference to Wausau's own judgment a few words later.

But we cannot stretch the latter language as far as Wausau would like without completely eviscerating the contractual obligation to give prompt notice. Any time Wausau chose, it could elect to give no notice at all, if the paragraph as a whole is read the way Wausau urges us to view it. Such a reading would read out of the contract the obligation to give "prompt" notice of the claim. Wisconsin courts frown on readings of contracts that make some words or sections entirely superfluous. See *D'Angelo v. Cornell Paperboard Products Co.*, 59 Wis.2d 46, 207 N.W.2d 846, 848–49 (1973); *Bulen v. West Bend Mutual Ins. Co.*, 125 Wis.2d 259, 371 N.W.2d 392, 394 (App.1985) ("[I]nterpretations which render insurance contract language superfluous are to be avoided where a construction can be given which lends meaning to the phrase."). We think the better reading, which easily reconciles both phrases, is to conclude that although the contract gave Wausau some discretion over when to provide notice and for what kinds of events, its discretion was tempered by an objective standard requiring notice to Zenith within a reasonable period of time of its realization that the claim could implicate the reinsurance policy. Compare *Imperial Cas. & Indem. Co. v. Chicago Housing Auth.*, 987 F.2d 459, 461–62 (7th Cir.1993) (applying Illinois law, and holding that although the contract only required notice of potential claims "as soon as practicable," the insured party nonetheless had to "act reasonably" in order to benefit from the discretionary language); *Continental Cas. Co. v. Stronghold Ins. Co.*, 77 F.3d 16, 20 (2d Cir.1996), citing *Christiania General Ins. Corp. v. Great American Ins. Co.*, 979 F.2d 268, 275 (2d Cir.1992) (under New York law, contractual clauses such as " 'prompt notice' " and "notice 'as soon as practicable' " require notice within an objectively reasonable time after duty arises); *American Employers Ins. Co. v. Metro Reg'l Transit Auth.*, 12 F.3d 591, 594, 598 (6th Cir.1993) (same under Ohio law); *Brown v. State Farm Mutual Auto. Cas. Ins. Co.*, 506 F.2d 976, 978–79 (5th Cir.1975) (same under Alabama law).

■ This much establishes Wausau's duty to give Zenith notice within a reasonable time following its recognition that the rein-surance policy was at risk. Three more issues remain: first, do the undisputed facts show that its September 17, 1992, notice was unreasonably late; second, is prejudice to Zenith a required element of its case, and if so, do the undisputed facts demonstrate prejudice; and third, as an alternative ground for the initial finding of a breach of contract, did Wausau also breach an implied duty of utmost good faith, or even ordinary good faith, in its dealings with Zenith?

There is no question that the September 17, 1992, notice came very late in the day from Zenith's perspective. This was, after all, more than three months after the jury's verdict, and it was even after the court had ruled on all post-verdict motions. Part V of the reinsurance contract speaks of the Reinsured's duty to "forward promptly to the Company copies of such pleadings and reports of investigation as may be requested by the Company." It is absurd to think that this means copies of pleadings from a functionally closed file. Lest one be tempted to think along those lines, however, part V goes on to give the reinsurance company the right to participate jointly with the Reinsured in "the investigation, adjustment or defense of claims." Even if, as we were told at oral argument, reinsurance companies do not usually avail themselves of this privilege, the fact remains that it is a right given to Zenith in this contract. Wausau's choice of a notice date completely nullified Zenith's opportunity to exercise its rights under part V of the contract.

Perhaps recognizing the frailty of its justification for the late date of notice, Wausau argues that its corporate procedures for contacting facultative reinsurers were objectively reasonable, which is all that is necessary. Wausau had no particular incentive to gamble with Zenith's money: under this policy, Wausau stood to lose a dollar for every dollar Zenith would be required to pay. Even so, on this record no rational trier of fact could conclude that Wausau's notice procedures at the time of the Smith litigation were objectively reasonable. To the contrary, the undisputed facts in the record paint a picture of a bureaucracy with internal divisions hermetically sealed off from one another, where the

right hand literally did not know what the left was doing (or the risks to which the left might be exposed). Dave Becker, for example, Wausau's Senior Reinsurance Claims Supervisor, was the individual responsible for notifying reinsurers of possible claims under their policies. But no procedures were in place to keep Becker informed of the handling of the actual claim under the primary policy, which meant that he had no way of knowing when the umbrella policy might become implicated. Instead, in 1991 and 1992 he followed the practice of initially notifying facultative reinsurers on umbrella policies of a claim *after* a file under Wausau's umbrella policy had been opened. Wausau never provided notice before that time. The umbrella policy department, under Warren and his supervisor, had no idea that facultative reinsurers like Zenith did not receive notice of claims until Wausau opened its own file. Furthermore, Wausau only opened umbrella policy claim files when it (1) was ready to authorize payment in excess of the primary policy limit, or (2) had received news of a verdict in excess of the primary policy limit. As both the magistrate judge and the district judge commented here, these policies taken together practically assured that reinsurers like Zenith would receive untimely notice every time.

Neither the procedures Wausau customarily used nor the actual date on which Zenith received its notice satisfied the contractual obligation to provide "prompt" notice of an event that *might* implicate the reinsurance coverage. The word "might" does not mean "almost certainly will" or "already has," even though Wausau handled its policies as if that had been the case. The effect on Zenith of Wausau's systems would have been different if Wausau itself had genuinely believed Smith's recovery could not exceed $1 million, but this was plainly never Wausau's view. As early as July 30, 1991, Wausau told its treaty reinsurers that the claim had a potential settlement value of $2 to $3 million; Wausau was continually increasing its own reserves to cover Smith's potential recovery; and Wausau's own attorney was raising an alarm even before the trial began. These are important facts. In light of both Wausau's knowledge and its ineffective internal systems, we conclude that Wausau breached its obligations under part V of the contract to provide prompt notice to Zenith.

◼ The next question—whether untimely notice alone is enough to entitle Zenith to its declaratory judgment, or if something more must be shown—is another one for which we must take care to follow Wisconsin law. We begin with Wis. Stat. § 631.81, which provides:

(1) Timeliness of notice. Provided notice or proof of loss is furnished as soon as reasonably possible and within one year after the time it was required by the policy, failure to furnish such notice or proof within the time required by the policy does not invalidate or reduce a claim unless the insurer is prejudiced thereby and it was reasonably possible to meet the time limit.

This section in terms addresses only those late notices that arrive within a year of the time required by the policy. For those cases, the claim will not be invalidated unless two criteria are met: the insurer was prejudiced by the late notice, and it was "reasonably possible" to give timely notice. In our case, it is unclear at what point the notice was due, and thus it is difficult to say whether the rule of § 631.81 applies. Even if it does not, however, the Wisconsin Supreme Court has addressed the situation of late notice furnished more than a year after it should have arrived. In *Gerrard*, then-Justice Coffey (now our colleague) held that "where notice is given more than one year after the time required by the policy, there is a rebuttable presumption of prejudice and the burden of proof shifts to the claimant to prove that the insurer was not prejudiced by the untimely notice." 277 N.W.2d at 872.

◼ Wisconsin, therefore, requires some kind of showing of prejudice in all cases in which an insurance company receives late notice. It simply shifts the burden of proof from the insurer to the claimant when the notice is more than a year after the time required by the policy. The district court thought this irrelevant, because it believed that prejudice did not matter if the insured acted in bad faith. It found this rule, however, in the Second Circuit's decisions in *Uni-*

gard and *Christiania*, which relied on New York's bad faith exception to the prejudice requirement. See *Unigard*, 4 F.3d at 1069; *Christiania*, 979 F.2d at 281. We find no analog to that New York rule in Wisconsin law. Therefore, either Zenith must show prejudice or Wausau must show the lack of it, depending on how late Wausau's notice was.

For this purpose, the language of part V giving Wausau discretion over the time when notice would be given is of some importance. Some facts indicate that Wausau was aware that Smith's claim might be worth as much as $2 to $3 million as early as its May 17, 1991, memorandum evaluating the case. If that is the date on which its duty to give notice to Zenith ripened, then the September 17, 1992, notice was obviously outside the one-year window recognized by § 631.81 and *Gerrard*, and Wausau must bear the burden of demonstrating that Zenith was not prejudiced by the lateness of the notice. On the other hand, Wausau's interests and Zenith's, like those of most reinsureds and their reinsurers, were virtually identical, see *Unigard*, 584 N.Y.S.2d 290, 594 N.E.2d at 574, especially since for the second million dollars of exposure, each bore 50% of the risk. Wausau's own actions, reflected in the level of the reserves it set for the primary policy and its decision not to open a file under the umbrella policy, indicate that it considered such a high verdict to be very speculative at that early date. Even *Christiania* held that mere speculation and remote contingencies do not trigger the duty to notify. If that duty arose as late as Hurney's April 1992 pre-trial memorandum, when the likelihood of a multi-million-dollar verdict had become much more clear, then the September notice was within the one-year window and it would be Zenith's task to demonstrate prejudice.

Although we have some doubt about Zenith's ability to show prejudice from the lack of notice, given the fact that neither it nor the treaty reinsurers apparently ever intervened in the defense of a case, the record at this juncture does not conclusively reveal either when under this policy notice to Zenith was required, or whether Zenith was prejudiced by Wausau's tardiness. Zenith suggests that earlier notice would have allowed it to try to influence Wausau to accept Smith's settlement offer of $1.5 million and to participate in the investigation and defense of the case as a whole. We consider it important not to resolve a potentially disputed issue of fact on the basis of an appellate record that was not created with this precise focus. We therefore conclude that further proceedings will be necessary on the issues of the timeliness of Wausau's notice for purposes of § 631.81 and *Gerrard*, and prejudice to Zenith.

 Last, we consider briefly Zenith's argument that Wausau breached an implied duty of utmost good faith and fair dealing in the contract. Once again Zenith has jumped too quickly to New York law, which does apply a stringent duty of "utmost" good faith in reinsurance cases. See *Unigard*, 4 F.3d at 1066. Wisconsin courts have not taken this step. Instead, they acknowledge a general duty of good faith and fair dealing between the parties to a contract. *In re Estate of Chayka*, 47 Wis.2d 102, 176 N.W.2d 561, 564 n. 7 (1970); *Bozzacchi v. O'Malley*, 211 Wis.2d 622, 566 N.W.2d 494, 495 (App.1997). Chayka, in turn, has been interpreted as holding that "a party may be liable for breach of the implied covenant of good faith even though all the terms of the written agreement may have been fulfilled." See *Foseid v. State Bank of Cross Plains*, 197 Wis.2d 772, 541 N.W.2d 203, 212 (App.1995), *review denied*, 546 N.W.2d 469 (Wis.1996). A party seeking to recover under this theory must show something that can support a conclusion that the party accused of bad faith has actually denied the benefit of the bargain originally intended by the parties. See *Foseid*, 541 N.W.2d at 212–13; *Schaller v. Marine Nat'l Bank of Neenah*, 131 Wis.2d 389, 388 N.W.2d 645, 651 (App.1986). Here, Zenith must show that Wausau unfairly denied it the benefit of the original bargain. On this record, at least, this amounts to the same thing as the showing of prejudice that must be made under Zenith's conventional breach of contract claim, although for the good faith claim, the burden of proof remains on Zenith no matter how long or unreasonable the delay in Wausau's notice.

This case, as we said at the outset, is about information: information Wausau was required under the contract to share with Zenith sooner than it did, and the consequences of Wausau's failure to do so. Although the district court correctly concluded that Wausau breached its contractual duty to provide notice to Zenith, it should not have granted summary judgment for Zenith on its own claims and on Wausau's counterclaim without resolving the question of prejudice to Zenith from Wausau's breach at a trial, given the disputes over when notice should have been given and whether Zenith was actually prejudiced by the timing of the notice. We therefore REVERSE and REMAND for further proceedings consistent with this opinion. Each party shall bear its own costs on appeal.