In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-4058

INTERACTIVE INTELLIGENCE, INCORPORATED,

*Plaintiff-Appellant,*

*v.*

KEYCORP, KEYBANK NATIONAL ASSOCIATION, and
ADAM RAVENS,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 05 C 1518—**Larry J. McKinney,** *Judge.*

ARGUED SEPTEMBER 12, 2008—DECIDED OCTOBER 24, 2008

Before RIPPLE, ROVNER, and EVANS, *Circuit Judges*.

EVANS, *Circuit Judge*.    Interactive Intelligence, Inc.
filed this action against KeyCorp, KeyBank, and Adam
Ravens (a former employee of KeyBank), alleging various
contractual and tort theories of liability arising out of
foreign exchange (FX) currency transactions. The district
court granted the defendants' motions for summary
judgment; Interactive appeals.

Interactive and KeyBank had a commercial banking relationship in which Interactive began executing FX transactions through the bank. The transactions involved both the conversion of dollars into foreign currencies and foreign currencies into dollars. Ravens, a KeyBank FX salesman based in Cleveland, Ohio, had primary responsibility for Interactive's account during most of the relationship. KeyBank, not surprisingly, made a profit from the transactions. The parties continued their relationship for over seven years.

During the first three years of their relationship the parties did business without a written contract. Traci Shaw, who worked in Interactive's accounting department, arranged FX transactions. When she received an invoice with an amount stated in foreign currency, she would go to the Internet and "come up with a conversion." She gave the information to Keith Midkiff, Interactive's vice-president of finance. After she received approval from him, she "would fax that to KeyBank for them to initiate the transfer." Then a person at KeyBank would "insert whatever information she needed to in her system, initiate the transfer, and then she would call [Shaw] with an exchange rate and the U.S. dollar amount." Shaw then "entered the invoice into the system with the U.S. dollar amount." Later confirmations were made by fax or KeyBank's FX online system. The terms were binding on both parties if Interactive did not object within two business days. But what was KeyBank to be paid for its services?

John Gibbs, a cofounder and former executive vice-president of Interactive, testified that he had conversa-

tions in either 1997 or 1998 with "someone" from KeyBank about having the bank perform FX transactions "at market." Gibbs understood "at market" to mean either the exchange rate from the *Wall Street Journal* or the rate a person could obtain using a Visa credit card. He also recalled that Interactive agreed to pay KeyBank a processing fee for each FX transaction. In other words, Gibbs thought Interactive would pay a fee per transaction, rather than "on a spread" (a percentage markup of an exchange rate).

In May 2001, the parties signed a contract which was silent on the issue of fixed fees versus "a spread." The contract indicated that Interactive was not relying on advice from KeyBank in entering FX transactions, but rather had consulted with its own advisors.

Information on exchange rates is widely available. Interactive's assistant controller, Barbara Claassen, for instance, knew that she could find information about exchange rates on the Internet. And, in fact, at some point Interactive noticed that the rates KeyBank was using were not the same as the ones published in the *Wall Street Journal*. Shaw was asked to investigate, and Ravens told her the discrepancy resulted from the differences in the size of the transactions. Later, another Interactive official noticed significant disparities but did not request an investigation. In its suit, Interactive contends that it was overcharged more than $2 million for KeyBank's services.

The culprit, according to Interactive, was Ravens. He worked for KeyBank as an FX trader from 1998 to 2005.

He was an employee at will, but as a condition of his employment he agreed to comply with the "KeyBank Code of Ethics," which contained guidelines concerning confidentiality, self-interested transactions, gifts, entertainment, loans, etc. No one at Interactive saw KeyCorp's Code of Ethics during the time KeyBank provided it with FX services.

Ravens applied a spread to the FX transactions, and the amount of the spread gradually increased over the years. Ravens did not inform Interactive that he was applying a spread. But KeyBank was allegedly aware that Ravens aggressively used a spread and lost customers as a result. KeyBank eventually terminated Ravens' employment in July 2005.

In an attempt to recover some of what it contends were overcharges, Interactive set out a number of causes of action, which were dismissed on summary judgment. In this appeal, Interactive claims to be a third-party beneficiary of the "employment contract" between Ravens and KeyBank. Interactive also claims that KeyBank was negligent in supervising Ravens and that KeyBank breached a fiduciary duty and an oral contract. Interactive filed some of the claims as class action claims. The district judge dismissed those claims as well.

One problem in this case, which is not adequately addressed by the parties, is what law applies to the claims. On the claims based on the supposed employment contract, KeyBank says the parties agree that Ohio law governs; however, Interactive cites the law of Connecticut and New Jersey. KeyBank says that on all other claims

Indiana law controls; however, while Interactive relies on Indiana law on the claims based on breach of a fiduciary duty and of oral contract, it says Ohio law applies to the negligence claims. Like much else in this case, what law should apply is unclear, but the deficiencies in the plaintiff's case are clear under the laws of either Ohio or Indiana. We will proceed with our *de novo* review. *Gillespie v. Equifax Info. Servs., L.L.C.*, 484 F.3d 938 (7th Cir. 2007).

Interactive's first claim is that it is a third-party beneficiary of a contract between KeyBank and Ravens and therefore a beneficiary of KeyBank's Code of Ethics, which Ravens allegedly violated. This claim is hopelessly flawed. First, Ravens was an at-will employee. He signed a form, as a condition of his employment, saying he would abide by the bank's Code of Ethics, but he did not have an employment contract. Second, it would be a rather bad public policy, it seems to us, to say that customers are third-party beneficiaries of codes of ethics. If that were the case, a company could avoid liability by, of course, simply doing away with its ethics codes. That would not be very desirable. Furthermore, there is no evidence that Interactive relied in any way on the Code of Ethics in its dealings with the bank. In short, the evidence cannot support this bizarre claim that Interactive is a beneficiary of any sort of contract or code between Ravens and his employer.

Interactive also contends that KeyBank was negligent for failing to properly supervise Ravens. Citing *Greenberg v. Life Insurance Co. of Virginia*, 177 F.3d 507 (6th Cir. 1999), Interactive says that KeyBank negligently failed (a) to

train and supervise its employees about making proper disclosures; (b) to monitor the accuracy of FX trades; and (c) to take action to stop Ravens' "aggressive spreading" despite the company's knowledge of his activities. This, Interactive says, is a well-recognized claim under Ohio law—apparently as set out in *Greenberg*. KeyBank, on the other hand, says that under Indiana law, because the parties have a contract, the extent of any duty owed is a matter of contract interpretation. *Perryman v. Huber, Hunt & Nichols*, 628 N.E.2d 1240 (Ind. Ct. App. 1994). KeyBank says a "duty" cannot be used to expand the obligations the parties assumed in their contract, relying for this proposition on *Zenith Insurance Co. v. Employers Insurance of Wausau*, 141 F.3d 300 (7th Cir. 1998), a case, by the way, in which the law of Wisconsin controls—adding yet more variety to our stroll through state law.

Unfortunately for Interactive, the case on which it relies does not support its claim. In *Greenberg*, the court quoted an Ohio case for the proposition that an "underlying requirement in actions for negligent supervision and negligent training is that the employee is individually liable for a tort or guilty of a claimed wrong against a third person, who then seeks recovery against the employer." *Strock v. Pressnell*, 527 N.E.2d 1235, 1244 (1988). *Greenberg* does not simply say, as Interactive would have us believe, that "an employer always has a duty to adequately train and supervise its employees so as not to cause injury to others." For KeyBank to be negligent, Ravens must have breached a duty of care he owed Interactive. But he had no such duty.

It goes without saying that Ravens had no fiduciary duty to Interactive. Interactive contends, however, that a fiduciary relationship should be "presumed" even between contracting parties in situations in which one party has a superior position and sustains a substantial advantage over the other. The hoary case, which predates America's entry into World War I, that Interactive relies on is *Westphal v. Heckman*, 113 N.E. 299, 301 (Ind. 1916). In that case, the court said:

> There are certain legal and domestic relations in respect to which the law raises a presumption of trust and confidence on one side and a corresponding influence on the other. The relations of attorney and client, principal and agent, husband and wife, and parent and child, belong to this class, and there may be others. Where such a relation exists between two persons and the one occupying the superior position has dealt with the other in such a way as to sustain a substantial advantage, the law will presume that improper influence was exerted and that the transaction is fraudulent.

To put it mildly, *Westphal* is not helpful. The facts in that case are that a few days before his death, Westphal conveyed property to his son to the exclusion of his two daughters, who promptly sued, claiming the son had undue influence over their father. In that context the court set out the presumption we quoted but then found that it applied as to the influence of a parent over a child, but not a child over a parent. So the presumption did not

carry the day in *Westphal*.[1] In our view, the Indiana courts would not extend the presumption to a commercial relationship like the one Interactive had with KeyBank.

Our conclusion is buttressed by *Wilson v. Lincoln Federal Savings Bank*, 790 N.E.2d 1042, 1046 (Ind. Ct. App. 2003), where the court says that a "business or 'arm's length' contractual relationship does not give rise to a fiduciary relationship. That is, the mere existence of a relationship between parties of bank and customer or depositor does not create a special relationship of trust and confidence." (Internal citation omitted.)

It is true that a bank may owe a customer a fiduciary duty if a confidential relationship exists between them. *Paulson v. Centier Bank*, 704 N.E.2d 482 (Ind. Ct. App. 1998). But there is nothing confidential in the FX transaction. The uncontroverted evidence shows that Interactive's employees knew that exchange rates were available on the Internet and in the *Wall Street Journal*. In fact, on occasion, Interactive employees asked KeyBank about the reasons for the difference between published rates and the rates the bank was using. This is simply not a situation in which the bank was acting as a fiduciary.

Finally, Interactive says KeyBank breached a late 1990s oral contract. Gibbs (the former executive vice-president of Interactive) testified that he entered into an oral agree-

---

[1] A later case, *Rogers v. Nat'l City Bank of Evansville*, 622 N.E.2d 476 (Ind. 1994), found that the presumption of undue influence of a husband over a wife was superseded by statute in the case of joint bank accounts.

ment with KeyBank for its FX services. The terms of the agreement, he said, were that Interactive would "get foreign exchange services at market." When asked to explain "market," he said it would be the rate as published in the *Wall Street Journal* or what Visa would charge. The testimony continued:

> Q   All right. So it was your understanding that KeyBank would be making no profit on FX transactions done for Interactive?
>
> A   Not on a spread. It was mentioned that—of course we have to have some kind of processing fee or something to that effect. And I said, "Meaning?" And they said—he said, "A nominal processing fee." And I recall the example being, like, $23, $17, depends, $27, depends on the size of the transaction, but we need to charge some kind of processing fee.

Later he said, "Again, I was told we would get it at exchange—at market rate. There would be no spread." Gibbs also testified that he left the working out of the details to Midkiff (Interactive's vice-president of finance). However, Midkiff said that he did not recall entering into any agreement other than the signed contract in 2001.

The supposed oral contract is too vague to be enforceable. *See Pepsi-Cola Gen. Bottlers, Inc. v. Woods*, 440 N.E.2d 696 (Ind. Ct. App. 1982). An agreement to work out more definite terms at some future time is not enforceable. *Wolvos v. Meyer*, 668 N.E.2d 671 (Ind. 1996). That is all that the evidence can possibly show in this case, and accordingly there is no enforceable oral contract.

For these reasons, we will affirm the judgment dismissing Interactive's claims against all defendants. There is no need, then, to consider the appeal relating to dismissal of requests for class action status.

The judgment of the district court is AFFIRMED.