ANSUL, INC. and Tyco International (US), Inc.,
Plaintiffs-Appellants,

v.

EMPLOYERS INSURANCE COMPANY OF WAUSAU,
Defendant,

HARTFORD ACCIDENT & INDEMNITY COMPANY,
Defendant-Third-Party Plaintiff,

v.

TRAVELERS CASUALTY AND SURETY COMPANY,
Centennial Insurance Company, Columbia
Casualty Company, Gibraltar Casualty Company,
Insurance Company of North America, National
Union Fire Insurance Company, Zurich Insurance
Company and Employers Mutual Liability
Insurance Company, Third-PartyDefendants,

CERTAIN UNDERWRITERS AT
LLOYDS & LONDON MARKET INSURANCE COMPANIES,
Third-Party Defendant-Respondent.

Court of Appeals

*No. 2011AP2596. Submitted on briefs September 4, 2012.
—Decided November 27, 2012.*

2012 WI App 135

(Also reported in 826 N.W.2d 110.)

374

376

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Joseph P. Wright* and *Barbara A. Neider* of *Stafford Rosenbaum LLP*, Madison.

On behalf of the third-party-defendant-respondent, the cause was submitted on the brief of *Jeffrey A. Schmeckpeper* of *Kasdorf, Lewis & Swietlik, S.C.*, Milwaukee, and *Matthew B. Anderson, John G. McAndrews* and *Jaimie Ginzberg* of *Mendes & Mount LLP*, New York, NY.

Before Hoover, P.J., Peterson and Mangerson, JJ.

¶ 1. MANGERSON, J. Between October 1969 and February 1980, Certain Underwriters at Lloyd's & London Market Insurance Companies ("Lloyd's") supplied Ansul, Inc. and Tyco International (US), Inc. ("Ansul") with nine excess policies with varying coverage dates. From the 1950s to 1977, Ansul caused severe environmental damage by contaminating groundwater near the Menominee River with substantial quantities of arsenic. The Wisconsin Department of Natural Resources ("DNR") became involved in the early 1970s, and in 1981 ordered Ansul to construct a groundwater treatment system that operated until 1986, at a cost of over $11 million. In 1990, the federal Environmental Protection Agency ("EPA") determined that significant quantities of arsenic remained, and ultimately ordered Ansul to conduct further remediation.

¶ 2. Ansul did not notify Lloyd's of the contamination or government-ordered remediation until 1997, and then only by filing a declaratory action against Lloyd's in New Hampshire. Ansul later commenced similar actions in Wisconsin, which were consolidated and ultimately dismissed on summary judgment. The circuit court concluded Ansul was not entitled to coverage because it had breached the notice and cooperation clauses of the pertinent policies. We agree and affirm.

## BACKGROUND

### A. Contamination and Cleanup

¶ 3. Between 1957 and 1977, Ansul produced agricultural herbicides containing both organic and inorganic arsenic. From 1957 until the early 1960s, waste arsenic salt was discharged directly into the Menomi-

nee River. Ansul also stored salt in unlined waste piles that were not covered until 1973. In 1967, Ansul transferred most of the existing waste salt, and newly produced salt, to a polyethylene-lined concrete storage vault. The vault developed cracks and the liner ruptured. By 1977, Ansul was storing approximately 95,000 tons of arsenic salt in the vault and in various other locations at its Marinette site.

¶ 4. The DNR became involved with the arsenic salt problem in 1971. In 1973, it issued consent order No. 2A-73-714 to Ansul. The DNR found the waste salt was a toxic or hazardous solid waste under Wisconsin law and required "special storage, handling, and disposal." It found that the vault, which was uncovered and exposed, was not satisfactory, as the DNR suspected that it was leaking and feared that the vault was in danger of collapse from the 37,500 tons of salt piled ten feet above its side walls. The DNR also noted that some salt had been stored outside the vault on a loading dock within ten feet of the Menominee River. In all, the DNR concluded the salt "is not being stored in a safe location in a closed container which is safe for said waste," and cited several violations of Wisconsin law. Among other things, the DNR required Ansul to study groundwater conditions and treatment and restoration technologies, establish a preliminary sampling and monitoring program, and implement a long-term plan for disposing of existing and newly generated arsenic salt.

¶ 5. Ansul representatives met with officials from the DNR and Wisconsin Attorney General's office in 1974. According to a memo from this meeting, an analysis of groundwater samples indicated "that Ansul has severely contaminated the local groundwaters with organic and inorganic arsenic, in violation of state

379

laws." A DNR official noted that although well data indicated contamination, the existence or degree of environmental damage had not yet been established. Accordingly, Ansul agreed to perform a groundwater survey, construct a groundwater model showing the rate of arsenic movement, and sample the Menominee River water, sediment, and wildlife. An October 1, 1974 memorandum from an Ansul employee recognized "contamination of ground water at the Marinette plant" and noted ongoing efforts to identify "methods which might be studied as means of removing arsenicals from the ground water." Another employee wrote, "it is just a question of time until Wis. DNR demands clean-up."

¶ 6. Discussions between the DNR and Ansul regarding cleanup intensified over the next few years. In 1976, Ansul prepared a report for the DNR describing "a suggested approach to the evaluation and possible restoration of contaminated alluvial aquifer groundwaters." The report forecasted significant capital and operating expenditures, although it qualified the projections by noting that the system's cost could not be accurately estimated without an engineering design. In 1978, the waste salt stored at the site was removed. Nonetheless, Ansul anticipated budgeting between $145,000 and $215,000 for groundwater-related expenses in 1979. Ansul's budget estimate acknowledged the possibility of long-range costs, including additional cleanup research, actual cleanup of groundwater, and disposition of contaminated river sediments, but stated that no "reasonable estimate" of those costs could be made.

¶ 7. Ansul entered into further consent orders with the DNR in 1979 and 1981. The 1981 order required Ansul to construct and operate a groundwater treatment system. The EPA notified the DNR by letter

that the consent order was in the best interests of the environment. The system operated from 1981 to 1986, treating 16 million gallons of groundwater and extracting 350 tons of arsenic.

¶ 8. In 1986, Ansul petitioned the DNR to discontinue groundwater extraction. Ansul provided numerous technical, economic, and environmental factors in support of this request, among them that it had spent $11 million on arsenic salt disposal and groundwater treatment since 1978. The DNR granted Ansul's petition, finding Ansul had removed a sufficient amount of groundwater and the remaining arsenic was located in the silt layer, where it would be difficult to extract. The treatment facility was decommissioned in 1986, but Ansul was required to submit a long-term groundwater monitoring plan for the abandoned salt vault.

¶ 9. By 1990, Ansul had established a $5 million reserve to deal with on-site environmental problems. That year, the EPA found that significant quantities of arsenic remained under and adjacent to Ansul's facility. Pursuant to a consent order, Ansul was required to conduct a facility investigation and a corrective measures study, and submit bi-monthly reports to the EPA and DNR. According to a 1991 internal memorandum, Ansul estimated the cost of cleanup alone at "somewhere between $8 million and $15 million."

¶ 10. After additional studies, the EPA ordered Ansul to remediate contaminated areas. Ansul estimates it has spent over $46 million on remediation, with an additional $16 to $30 million in future costs likely.

## B. The Excess Insurance Policies

¶ 11. Between October 1969 and February 1980, Ansul maintained nine separate excess liability policies

with Lloyd's. These policies had varying attachment points[1] and dates of coverage. Policies K22613 and K24708 attached at $1.25 million, with coverage dates of October 1969 to October 1972 and October 1972 to October 1974, respectively. Policy UFL1558 was effective between October 1974 and October 1977 and attached at $250,000. Policy UGL0991, with an attachment point of $5.25 million, provided coverage between October 1975 and October 1978. Policy UJL1716 was effective between October 1977 and October 1979 and attached at $1.25 million. Policies UKL1310 and UKL1311 provided coverage between October 1978 and December 1979 and had attachment points of $6.25 million and $16 million, respectively. The final two policies, 80DD1930 and 80DD1931, were effective between December 1979 and February 1980, with attachment points of $1 million and $6 million, respectively.

¶ 12. According to a 1990 internal memorandum, Ansul was advised by its brokers not to give notice of the environmental issues because the insurers would likely deny liability and increase Ansul's premiums. Nonetheless, in 1991, Ansul began notifying its insurers—but not Lloyd's—that it may be liable for waste investigation and cleanup under state and federal law. Insurance Company of North America, from which Ansul had purchased coverage between 1979 and 1983, was notified in 1991 and again in 1997 of Ansul's claim for indemnification. Wausau Insurance Company, from whom Ansul had purchased three annual policies between 1966 and 1968, received notice in 1992 and 1997.

---

[1] "Attachment point," as used in reference to excess liability policies, refers to the amount in covered claims that must be paid by underlying insurers before the excess insurer's obligation to pay arises. *Westport Ins. Corp. v. Appleton Papers, Inc.*, 2010 WI App 86, ¶ 19 n.13, 327 Wis. 2d 120, 787 N.W.2d 894.

## C. The Litigation

¶ 13. In 1997, Ansul commenced a declaratory action in New Hampshire against Lloyd's. Lloyd's received notice of the service of process on December 22, 1997. This was the first notice of Ansul's claim regarding the Marinette site that Lloyd's received.

¶ 14. Ansul commenced the present action in Marinette County in 2004 against Lloyd's and other insurers.[2] Lloyd's filed a motion for summary judgment, which the circuit court granted. The court concluded that, despite years of negotiation, investigation, and remediation with the DNR and the EPA, Ansul failed to timely notify Lloyd's of its potential liability. It also determined Ansul breached the policies' "Assistance and Cooperation" clauses by "immediately put[ting Lloyd's] in an adversary position by suing them."[3] Ansul appeals the court's coverage determination.

## DISCUSSION

¶ 15. The standards governing review of a grant of summary judgment are well established. We review a summary judgment de novo, but apply the same methodology as the circuit court. *Tews v. NHI, LLC*, 2010 WI 137, ¶ 40, 330 Wis. 2d 389, 793 N.W.2d 860. We must

---

[2] Ansul resolved its claims against all insurers except Lloyd's during the course of litigation.

[3] In addition, the circuit court concluded a pollution exclusion in seven of the policies precluded coverage. It also determined that the known loss doctrine barred coverage under some of the policies because Ansul knew of the arsenic contamination by October 1974. Because we conclude coverage under all of the policies is precluded by Ansul's untimely notice and failure to cooperate, we need not address these issues.

examine the pleadings to determine whether claims have been stated, and then determine whether any material factual issues have been presented. *Id.*, ¶ 41. Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.*, ¶ 42. The purpose of summary judgment is to avoid trials when there is nothing to try. *Id.*

¶ 16. At issue in this case are nine excess insurance policies. The interpretation of an insurance policy presents a question of law. *Rockline, Inc. v. Wisconsin Physicians Serv. Ins.*, 175 Wis. 2d 583, 589–90, 499 N.W.2d 292 (Ct. App. 1993). The same rules of construction that govern general contracts apply to insurance policies. *Folkman v. Quamme*, 2003 WI 116, ¶ 12, 264 Wis. 2d 617, 665 N.W.2d 857. We construe insurance policies to give effect to the intent of the parties as expressed in the language of the policy. *Id.* If that language is unambiguous, our task is merely to apply those terms. *Rockline*, 175 Wis. 2d at 590. We construe ambiguous clauses in insurance policies in favor of the insured. *Folkman*, 264 Wis. 2d 617, ¶ 13.

¶ 17. Each policy contained provisions relating to notice and cooperation. Each "Notice of Occurrence" provision reads substantially as follows:

> Whenever the Assured has information from which they may reasonably conclude that an occurrence covered hereunder involves injuries or damage which, in the event that the Assured shall be held liable, is likely to involve this Policy, notice shall be sent . . . as soon as practicable, provided however, that failure to give notice of any occurrence which at the time of its happening did not appear to involve this Policy, but which, at a

later date, would appear to give rise to a claim hereunder, shall not prejudice such claims.

The policies' "Assistance and Cooperation" clauses include, in essence, the following language:

> The Underwriters shall not be called upon to assume charge of the settlement o[r] defense of any claim made, suit brought or proceeding instituted against the Assured but the Underwriters shall have the right and shall be given the opportunity to associate with the Assured or the Assured's underlying insurers, or both, in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves or appears reasonably likely to involve the Underwriters, in which event the Assureds and the Underwriters shall cooperate in all things in the defense of such claim, suit or proceeding.[4]

The circuit court concluded Ansul had breached both provisions and dismissed Ansul's claim.

## A. Timeliness of Notice

¶ 18. Ansul first contends coverage is not precluded by the notice provisions. Ansul agrees it was required to provide notice when it had information from which it could reasonably conclude that a covered occurrence caused damage that was "likely to involve"

---

[4] Ansul acknowledges that not every policy includes the text of the "Assistance and Cooperation" clause, but concedes that those without it are "follow form" policies that adopt the clause from the underlying policy. *See Wadzinski v. Auto-Owners Ins. Co.*, 2012 WI 75, ¶ 29, 342 Wis. 2d 311, 818 N.W.2d 819 ("following form" is an insurance term of art for a policy that incorporates the terms of an underlying policy to ensure that the same terms of coverage are maintained between primary and excess levels of insurance).

the policies. Ansul appears to concede that it did not give timely notice under eight of the policies. However, it maintains that as to policy UKL1311, a genuine dispute of material fact exists as to when it could reasonably conclude that the environmental damages were likely to reach the policy's $16 million attachment point.

¶ 19. "An insured is required to give timely notice to his or her insurer." *Neff v. Pierzina*, 2001 WI 95, ¶ 29, 245 Wis. 2d 285, 629 N.W.2d 177. Under some circumstances, this duty may arise later than the accident or occurrence that gives rise to liability. *See id.*, ¶ 37. The policies at issue here require notice "as soon as practicable," which we have construed to mean within "a reasonable time." *Gerrard Realty Corp. v. American States Ins. Co.*, 89 Wis. 2d 130, 142–43, 277 N.W.2d 863 (1979). The insurer's right and obligation to make a timely investigation are a condition precedent to their contractual duty of coverage. *Id.* at 140.

¶ 20. It is undisputed that, as of 1991, Ansul had spent in excess of $11 million on site investigation and remediation and had established a $5 million reserve to fund future cleanup expenses, which it estimated at "somewhere between $8 million and $15 million." Thus, by 1991 at the latest, Ansul should have known its liability for the contamination at the Menominee River site was likely to reach the $16 million attachment point for policy UKL1311.[5] Nonetheless, it waited six

---

[5] Ansul does not address or provide any facts relating to allocation of damages among the various policies. *See generally Westport*, 327 Wis. 2d 120, ¶¶ 68–80 (discussing allocation among "multiple years of policies, issued by a variety of compa-

years to notify Lloyd's of the claim, well after its other insurers had been notified. This constitutes unreasonable delay. *See id.* at 144 (twenty-two month delay in providing insurer with notice of a claim constituted non-compliance with policy's notice provisions as a matter of law).

¶ 21. Ansul argues the $5 million reserve and $8 to $15 million projection of future cleanup costs reflected "only what was possible . . . not what was probable or likely." It contends a jury could determine that Ansul did not know until 1997 that the cost of remediation was likely to reach UKL1311's attachment point. This is an untenable position. The undisputed record establishes that Ansul spent over $11 million before 1986 to investigate and remediate the contamination. When Ansul was told by the EPA in 1990 that significant quantities of arsenic remained, it should have been clear that Ansul was likely to bear significant additional cleanup costs.

¶ 22. What's more, Ansul's claim that it did not provide notice because of uncertainty regarding the extent of its potential liability is contradicted by the record. Ansul does not dispute—indeed, does not address at all—that it decided by 1990 not to furnish notice on advice from its brokers that Lloyd's would deny the claim and increase Ansul's premiums. Ansul's belief that Lloyd's would deny coverage does not excuse its failure to provide notice. *See Gerrard*, 89 Wis. 2d at 144–45; *see also RTE Corp. v. Maryland Cas. Co.*, 74

---

nies, with multiple layers of different amounts of coverage in each year and each layer"). Issues not raised on appeal are deemed abandoned. *Tatur v. Solsrud*, 167 Wis. 2d 266, 269, 481 N.W.2d 657 (Ct. App. 1992), *aff'd*, 174 Wis. 2d 735, 498 N.W.2d 232 (1993).

Wis. 2d 614, 622–23, 247 N.W.2d 171 (1976) ("An insured is not authorized . . . to speculate on his liability, where his duty is to report an accident or occurrence."). The question of determining coverage is the exclusive right of the insurer. *Gerrard*, 89 Wis. 2d at 144–45.

¶ 23. Lloyd's emphasizes that Ansul employees and representatives were unable to explain why Ansul did not notify the insurer sooner. Presumably, these witnesses either did not know or did not wish to reveal the undisputedly intentional nature of the omission. This, too, is bad for Ansul. A delay of as little as thirteen days, without explanation, can be unreasonable. *Parrish v. Phillips*, 229 Wis. 439, 440, 282 N.W. 551 (1938) (notice of accident provided thirteen days after statutory notice period expired deemed unreasonable); *see also Gerrard*, 89 Wis. 2d at 143–44 (collecting additional cases in which unexplained delays of three years, one year, and three months were deemed unreasonable as a matter of law).

¶ 24. Ansul next argues a genuine issue of material fact exists as to whether Lloyd's suffered prejudice because of the late notice. Pursuant to Wis. Stat. § 631.81, an insurer whose insured provides notice within one year of the time required by the policy must show that it was prejudiced and that it was reasonably possible to meet the time limit.[6] *Gerrard*, 89 Wis. 2d at 146. However, when notice is given more than one year

---

[6] Lloyd's argues it need not prove prejudice stemming from late notice for policies that incepted prior to Wis. Stat. § 631.81's adoption in 1976. *See Gerrard Realty Corp. v. American States Ins. Co.*, 89 Wis. 2d 130, 145–46, 277 N.W.2d 863 (1979). We need not address this argument because we conclude that, even if prejudice was required, no reasonable jury could conclude Lloyd's was not prejudiced on this set of facts.

after the time required by the policy, there is a rebuttable presumption of prejudice and the burden of proof shifts to the claimant to prove that the insurer was not prejudiced by the untimely notice. *Id.* at 146–47; *see also* WIS. STAT. § 632.26(2) ("Failure to give notice as required by the policy . . . does not bar liability under the policy if the insurer was not prejudiced by the failure, but the risk of nonpersuasion is upon the person claiming there was no prejudice.").

¶ 25. Ansul acknowledges that, since notice was given more than a year after the time required by the policies, there is a rebuttable presumption of prejudice. "Prejudice to the insurer in this context is a serious impairment of the insurer's ability to investigate, evaluate, or settle a claim, determine coverage, or present an effective defense, resulting from the unexcused failure of the insured to provide timely notice." *Neff*, 245 Wis. 2d 285, ¶ 44. Whether an insurer has been prejudiced is governed by the facts and circumstances in each case. *Id.*

¶ 26. In evaluating whether Ansul has put forth sufficient evidence rebutting the presumption of prejudice, we are mindful of the purpose of insurance notice requirements. Timely notice is critical because an insurer needs an opportunity to investigate possible claims against the policy or its insured while the witnesses are available and their memories are fresh. *Gerrard*, 89 Wis. 2d at 140 (citing *Kolbeck v. Rural Mut. Ins. Co.*, 70 Wis. 2d 655, 659, 235 N.W.2d 466 (1975)). The insurer's ability to investigate is impaired when

All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

"witnesses are no longer available or when witnesses become entrenched in a position because they have calculated the legal effect of their answers." *Neff*, 245 Wis. 2d 285, ¶ 59. Sometimes relationships among parties and witnesses change, memories fade, and records are lost. *Id.* An insurer cannot make a reasoned judgment as to its contractual obligations until it has had the opportunity to "examine and review the factual situation," and this investigation cannot commence until the insured has fulfilled its duty to provide notice. *Gerrard*, 89 Wis. 2d at 140, 142.

¶ 27. The length of the delay in this case is relevant to our prejudice inquiry. The environmental contamination occurred in the 1950s and continued, in different forms, throughout 1977. By 1974, Ansul was aware that it had severely contaminated the groundwater at the site, in violation of state law. Ansul's own report in 1976 forecasted significant capital and operating expenditures to restore the environment and by 1986 Ansul had spent over $11 million on cleanup efforts. Thus, at least by 1986—and likely much earlier as to several of the excess policies—Ansul's expenditures had exceeded the attachment point for all policies except UKL1311. Ansul's notice for these policies was at least eleven years late. With respect to UKL1311, we have concluded that Ansul's notice was at least six years late.

¶ 28. It is Ansul's burden to show that Lloyd's was not prejudiced by the untimely notice.[7] *See Fireman's Fund Ins. Co. of Wis. v. Bradley Corp.*, 2003 WI 33,

---

[7] Ansul's brief, while correctly reciting the allocation of the burden of proof, reads as though Ansul believes Lloyd's has an affirmative obligation to produce evidence of prejudice. For example, Ansul emphasizes that certain testimony discussed what Lloyd's "might have done" with proper notice instead of

¶ 59, 261 Wis. 2d 4, 660 N.W.2d 666. Yet Ansul concedes that some documents, including pre-1990 board minutes, have been lost to time.[8] It is likely that, given the length of the delay, witnesses are either unavailable or would not be able to recall the content of those documents or details of the pertinent events. In addition, Lloyd's designee testified the insurer would have investigated the claim and attempted to avoid litigation costs by negotiating with Ansul. *See Neff*, 245 Wis. 2d 285, ¶ 61 (insurer has a right to limit its liability by making

making statements with certainty. One individual, when asked what Lloyd's would have done if it had received notice in the 1980s, testified:

> Well, it's almost impossible for me to answer that question. You know, [Lloyd's] may have been involved more with regard to the underlying claim. We might have had input as to Tyco's positions that it's taking with the state and/or federal government. You know, there may well have been, you know, other evidence or documentation or information with regards to the claim.

> I mean, as far as I'm aware, through discovery we've learned that there's been certain board of directors meeting minutes lost going back pre-1990. And, you know, who knows what that said. Maybe we would have gotten a better understanding as to, you know, what the occurrence was or why notice wasn't provided earlier. You know, it's a very difficult question to answer.

We are sympathetic to the challenges Lloyd's faced in articulating what actions it would have taken if properly notified decades earlier. We reject Ansul's attempt to cast this testimony as establishing that Lloyd's would have "been content to let matters run their course." *See Kreckel v. Walbridge Aldinger Co.*, 2006 WI App 168, ¶ 18, 295 Wis. 2d 649, 721 N.W.2d 508 (enforcing presumption where insured failed to produce credible evidence that insurer would have performed the same investigation or employed the same negotiation strategies).

[8] Lloyd's notes these minutes may have been relevant to determine the extent of contamination and whether Ansul understood it had a known loss at the inception of the later policy periods.

391

coverage determinations promptly and enabling its adjusters to pay without suit). This, coupled with the undisputed fact that at least some potentially relevant evidence has been lost, establishes prejudice as a matter of law. *See Fireman's Fund*, 261 Wis. 2d 4, ¶ 59.

## B. Assistance and Cooperation

¶ 29. Ansul also argues a genuine issue of material fact precludes summary judgment on the policies' "Assistance and Cooperation" clauses.[9] These clauses are "of great importance and [their] purpose should be observed." *State v. Hydrite Chem. Co.*, 220 Wis. 2d 51, 72–73, 582 N.W.2d 411 (Ct. App. 1998) (quoting *Waste Mgmt., Inc. v. International Surplus Lines Ins. Co.*, 579 N.E.2d 322, 327–28 (Ill. 1991)). Such clauses protect the insurer's interests by permitting it to obtain relevant information concerning the loss while the information is fresh, decide on its obligations, and protect itself from fraud. 14 LEE R. RUSS, COUCH ON INSURANCE § 199:4 (3d ed. 1999).

¶ 30. The cooperation clauses at issue in this case unambiguously required Ansul to provide Lloyd's with an opportunity to associate with it and the underlying insurers in the control of any claim or proceeding reasonably likely to involve the policies. Further, Ansul was required to cooperate "in all things in the defense of such claim, suit or proceeding."

---

[9] We have already rejected one of Ansul's subarguments on this point: that the "Assistance and Cooperation" clause of policy UKL1311 was not triggered until 1997 because it was not clear the damages had reached that policy's attachment point. We need not address it further.

392

¶ 31. Tellingly, Ansul does not claim it has not breached the cooperation clauses. This is a wise concession. By providing notice in the form of a lawsuit, Ansul immediately set itself at odds with Lloyd's. In adopting an adversarial position from the outset, Ansul deprived Lloyd's of the "opportunity to associate with the Assured or the Assured's underlying insurers, or both, in the defense of any claim, suit or proceeding . . . ." Ansul engaged in years of negotiation and cooperation with the DNR and EPA without ever permitting Lloyd's to investigate the extent of Ansul's liability. *See In re Envtl. Ins. Declaratory Judgment Actions*, 600 A.2d 165, 167 (N.J. Super. Ct. Law Div. 1991) (during insurer's investigation process, policyholder has a duty to cooperate with its insurer and its agents/employees as to the factual allegations of any possible underlying liability actions). The lengthy delay in notice becomes all the more prejudicial because once the insured brings a coverage suit, the duty of cooperation may be circumscribed by the adversary process. *See Hydrite Chem.*, 220 Wis. 2d at 75 (cooperation clause does not supersede the attorney-client privilege or work product doctrine).

¶ 32. Instead, Ansul maintains that Lloyd's did not suffer prejudice as a result of its breach. "Notwithstanding proof of a contractual breach, in Wisconsin an insurer must also prove the breach is material and prejudicial." *Dietz v. Hardware Dealers Mut. Fire Ins. Co.*, 88 Wis. 2d 496, 503–04, 276 N.W.2d 808 (1979). Ansul contends Lloyd's was not prejudiced because it "would not have become involved in any negotiations with government regulators or attempted to control Ansul's response to the EPA's claim." As support, it cites the depositions of two Lloyd's designees and *Fireman's Fund*.

¶ 33. In *Fireman's Fund*, our supreme court analyzed whether an insurer's duty to defend was abrogated by the insured's failure to notify the insurer of a claim until almost fifteen months after an underlying lawsuit was filed.[10] *Fireman's Fund*, 261 Wis. 2d 4, ¶ 55. This late notice left the insurer with just two weeks to review a year's worth of discovery and prepare for a preliminary injunction hearing. *Id.*, ¶ 62. Nonetheless, our supreme court concluded that the insurer had not suffered prejudice. *Id.*, ¶ 63. The insurer's litigation manager testified that he would have handled the claim the same way even if he had received timely notice. *Id.*, ¶ 62.

¶ 34. In this case, no witness testified Lloyd's would have handled Ansul's claim the same way had it provided timely notice without immediately commencing litigation. In arguing to the contrary, Ansul reads the pertinent portions of deposition testimony too broadly. Lloyd's first designee stated that, although Lloyd's would not have handled DNR or EPA negotiations directly, it "may have had involvement behind the scenes talking to Tyco about the issue." The second designee agreed that Lloyd's would not have become directly involved in negotiations with the EPA, but said that Lloyd's would have tried to "investigate and communicate with Tyco without being in litigation."

¶ 35. Thus, it is apparent that by unnecessarily delaying notice and then immediately commencing a lawsuit, Ansul deprived Lloyd's of any ability to inves-

---

[10] Although *Fireman's Fund* was a notice-prejudice case, we see no reason why the applicable policy provision—here, the cooperation and assistance clauses—would alter the nature of the prejudice inquiry.

tigate the scope of, or basis for, Ansul's liability outside the adversary process. Ansul, with full knowledge of the underlying facts, had years in which to mitigate any potential coverage defenses available to Lloyd's, like the known loss doctrine or pollution exclusions found in some of the excess policies. Cooperation provisions are designed precisely to prevent fraud. *See* Russ, COUCH ON INSURANCE 3d, *supra.* Under these circumstances, we conclude no genuine issue of material fact exists regarding prejudice arising from breach of the cooperation clauses. Summary judgment was appropriate.

*By the Court.*—Judgment affirmed.