# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case Nos.:     2020AP1244
              2020AP1509

†Petition for Review filed

Complete Title of Case:


**KERRI LINK,**

     **PLAINTIFF,**

  **V.**

**JAY E. LINK,**

     **DEFENDANT-APPELLANT,†**

**MIDWEST FAMILY MUTUAL INSURANCE COMPANY,**

     **INTERVENOR-RESPONDENT.**

---

**JANE DOE 1, JANE DOE 2, JANE DOE 3, JANE DOE 4, JANE DOE 5, JANE DOE 6 AND JANE DOE 7,**

     **PLAINTIFFS,**

  **V.**

**JAY E. LINK,**

     **DEFENDANT-APPELLANT,**

**MIDWEST FAMILY MUTUAL INSURANCE COMPANY,**

     **INTERVENOR-RESPONDENT.**

| | |
|---|---|
| Opinion Filed: | February 1, 2022 |
| Submitted on Briefs: | April 13, 2021 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Stark, P.J., Hruz and Nashold, JJ. |
|     Concurred: | |
|     Dissented: | |

Appellant
ATTORNEYS:    On behalf of the defendant-appellant, the cause was submitted on the briefs of *Christopher L. Strohbehn, Kathryn A. Keppel* and *Jaclyn C. Kallie* of *Gimbel, Reilly, Guerin & Brown LLP*, Milwaukee.

Respondent
ATTORNEYS:    On behalf of the intervenor-respondent, the cause was submitted on the brief of *Brian A. Wood* and *Brandon D. Meshbesher* of *Lind, Jensen, Sullivan & Peterson, P.A.*, Minneapolis, Minnesota.

COURT OF APPEALS
DECISION
DATED AND FILED

February 1, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal Nos.  **2020AP1244**
**2020AP1509**

Cir. Ct. Nos.  **2019CV284**
**2019CV199**

STATE OF WISCONSIN                    IN COURT OF APPEALS

---

NO. **2020AP1244**

KERRI LINK,

    PLAINTIFF,

V.

JAY E. LINK,

    DEFENDANT-APPELLANT,

MIDWEST FAMILY MUTUAL INSURANCE COMPANY,

    INTERVENOR-RESPONDENT.

---

NO. **2020AP1509**

JANE DOE 1, JANE DOE 2, JANE DOE 3, JANE DOE 4,
JANE DOE 5, JANE DOE 6 AND JANE DOE 7,

    PLAINTIFFS,

V.

**JAY E. LINK,**

    **DEFENDANT-APPELLANT,**

**MIDWEST FAMILY MUTUAL INSURANCE COMPANY,**

    **INTERVENOR-RESPONDENT.**

---

APPEALS from orders of the circuit court for Douglas County: ANGELINE E. WINTON and JOHN P. ANDERSON, Judges. *Affirmed*.

Before Stark, P.J., Hruz and Nashold, JJ.

¶1 NASHOLD, J. These consolidated appeals arise out of separate lawsuits brought, respectively, by Kerri Link and Jane Does 1-7 (collectively, Plaintiffs) against Jay E. Link. Plaintiffs' claims stem from allegations that Link posted Plaintiffs' photographs, along with sexually suggestive and degrading captions about them, on a members-only fetish website.

¶2 Link sought insurance coverage for Plaintiffs' claims under his homeowner's policy with Midwest Family Mutual Insurance (Midwest).[1] However, Link then refused to provide responses to Midwest's discovery requests in the coverage proceeding, instead asserting his Fifth Amendment privilege against self-incrimination. Midwest subsequently sought a no-coverage declaration on that basis, arguing that Link had violated policy provisions requiring the insured to cooperate in the investigation and truthfully represent all material facts. The circuit

---

[1] Plaintiffs allege conduct falling within two policy periods. The two policies are materially identical, so for ease of reading, we discuss them in the singular.

courts granted summary judgment in favor of Midwest, each determining that Midwest had no duty to defend or indemnify Link for the underlying claims.[2] Link appeals, arguing that his failure to comply with Midwest's discovery requests cannot result in the denial of coverage. We disagree and, accordingly, affirm.

## BACKGROUND

¶3 We discuss the underlying lawsuits together because the factual allegations are similar and the instant motions are materially identical. Plaintiffs allege that Link, without their knowledge or consent, created sexually suggestive and derogatory posts about them on a members-only fetish website. Specifically, Kerri Link alleges that Link posted nude, partially nude, and sexually suggestive photographs of her that Link took during their marriage, along with sexually explicit, degrading, and false commentary about her. The Jane Doe plaintiffs allege that Link copied photographs of them from their Facebook pages and reposted the photographs on the fetish website, also adding sexually suggestive and false commentary about them. One Jane Doe plaintiff further alleges that Link posted photographs of another woman's vagina next to the plaintiff's Facebook photograph and falsely stated that these sexually explicit photographs were of the plaintiff. Plaintiffs brought claims for invasion of privacy, intentional infliction of emotional distress, negligent infliction of emotional distress, and defamation; they also sought punitive damages.

¶4 Link tendered his defense to Midwest, seeking coverage under the personal injury endorsement to his homeowner's policy. Midwest defended in both

---

[2] The Honorable John P. Anderson entered the order granting summary judgment in case No. 2019CV199. The Honorable Angeline E. Winton entered the order granting summary judgment in case No. 2019CV284.

3

cases under a reservation of rights and moved to intervene, bifurcate, and stay further proceedings on the merits. Once made part of the litigation, Midwest cross-claimed for a declaratory judgment in each case, seeking a determination that it had no duty to defend or indemnify Link.[3]

¶5      Midwest then served various discovery requests on Link in the coverage proceedings. It is undisputed that Link did not respond to these requests, instead invoking his Fifth Amendment privilege to avoid self-incrimination. *See* U.S. CONST. amend. V. (For ease of reading, we sometimes refer to Link's invocation of privilege as his discovery noncompliance.)[4]

¶6      Based on Link's discovery noncompliance, Midwest filed motions for summary judgment in both cases. Midwest argued that, per the policy's terms, Link was required to cooperate with the coverage investigation and not conceal or misrepresent any material facts. Midwest contended that Link's discovery noncompliance represented a breach of these contractual duties, thereby eliminating any possible duty of Midwest to provide coverage for the underlying claims. Both circuit courts agreed and granted summary judgment in favor of Midwest, and Link appealed. We discuss additional facts below, where relevant to our analysis.

---

[3] In Kerri Link's suit, the circuit court stayed proceedings on liability pending the resolution of coverage issues. In the Jane Doe plaintiffs' suit, the circuit court neither granted nor denied Midwest's motion to bifurcate and stay, ordered alternative dispute resolution, and set a date for dispositive motions on coverage to be filed.

[4] Link's discovery responses are not in the appellate record; however, Link does not dispute that he invoked his Fifth Amendment privilege and failed to respond to discovery requests.

## STANDARD OF REVIEW

¶7    The proper interpretation of an insurance policy is a question of law that we decide de novo. ***Severude v. American Fam. Mut. Ins. Co.***, 2002 WI App 33, ¶9, 250 Wis. 2d 655, 639 N.W.2d 772. Likewise, we review a grant of summary judgment de novo, applying the same methodology as the circuit court. ***Id.*** Summary judgment is appropriate where the pleadings and evidence submitted "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2) (2019-20).[5]

## DISCUSSION

¶8    Link seeks coverage for Plaintiffs' claims under the personal injury endorsement to his homeowner's insurance policy. As pertinent here, the endorsement requires Midwest to defend and indemnify Link in suits alleging slander, libel, and invasion of privacy.[6] The policy contains a concealment clause, stating, "We do not provide coverage to an 'insured' who, whether before or after a loss, has … [c]oncealed or misrepresented any fact upon which we rely, if the concealment or misrepresentation is material and is made with intent to deceive."[7]

---

[5] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[6] Specifically, the endorsement provides coverage for a claim for damages resulting from "personal injury," defined in pertinent part to "mean[] injury arising out of … [o]ral or written publication of material that slanders or libels a person [or] violates a person's right of privacy." Plaintiffs allege invasion of privacy, defamation, intentional infliction of emotional distress, and negligent infliction of emotional distress. The issue of which of these claims Link's policy might cover is not before us, and we do not address it.

[7] Link appears to argue that the concealment clause does not apply to his personal injury endorsement because that clause is contained within his main homeowner's policy. Per the policy's terms, however, the personal injury endorsement does *not* delete and replace the concealment clause in the main policy. Thus, the concealment clause remains a contractual condition of coverage.

The endorsement also contains a cooperation clause, requiring Link to "[c]ooperate with [Midwest] in the investigation, settlement or defense of any claim or suit," and stating that Midwest has "no duty to provide coverage" if Link's failure to do so is prejudicial to Midwest.

¶9     Midwest argues that Link breached the policy's concealment and cooperation clauses by not responding to Midwest's interrogatories, requests for admission, and requests for document production, all of which concern Link's posting photographs of and commentary about Plaintiffs, his intent in doing so, and like information.  As stated, Link does not dispute that he failed to respond to these discovery requests and instead invoked his Fifth Amendment privilege against self-incrimination.  Link argues, however, that Midwest cannot ultimately establish that his discovery noncompliance should result in loss of coverage.

¶10     We conclude that, for the following reasons, the undisputed facts show that Link violated the concealment and cooperation clauses of his policy and that these contractual breaches are grounds for coverage denial.  We note that each breach represents an independent basis for denying coverage.  For completeness, however, and because Link's arguments on these provisions overlap, we address Link's duties under both clauses.

### I. Application of **Walker**

¶11     Link raises several specific arguments on appeal that we address in more detail below; however, his central argument is that an insured's invocation of a Fifth Amendment privilege in a coverage dispute cannot be grounds for coverage denial.  In *State Farm Fire & Casualty Insurance Co. v. Walker*, 157 Wis. 2d 459, 459 N.W.2d 605 (Ct. App. 1990), we considered and rejected this general argument in the context of applying a policy's concealment clause.  We conclude that *Walker*

controls here and that its analysis applies to both the concealment and the cooperation clauses of Link's policy.

¶12    In *Walker*, the insurer, State Farm, was investigating a claim under a fire insurance policy and sought to question its insured, Walker, under oath. *Id.* at 463.  Walker, who was facing unrelated homicide charges, invoked his Fifth Amendment privilege. *Id.* at 463-64.  State Farm denied coverage on the grounds that Walker's refusal to answer material questions violated the concealment clause of the policy, and it sought a declaratory judgment to that effect. *Id.*  Walker counterclaimed for damages stemming from State Farm's denial of coverage. *Id.* at 464.  The circuit court dismissed Walker's claims, concluding that Walker had breached the concealment clause by refusing to answer questions material to State Farm's coverage investigation. *Id.*

¶13    On appeal, Walker "argue[d] that an insurance company cannot interpret the failure to answer questions as concealment when the insured, following an attorney's advice, invokes the fifth amendment to avoid self-incrimination." *Id.* at 468.  We rejected this argument, determining that, although Walker was entitled to invoke privilege, he was not entitled to avoid his contractual duties on that basis:

> The trial court correctly concluded that State Farm did not violate Walker's constitutional right to avoid self-incrimination.  The fifth amendment protects a defendant only when it is the state that is the questioner; the state can use the answers in a criminal prosecution.  Fear of self-incrimination does not exempt one from contractual duties.  Constitutional immunity has no application to a private examination arising out of a contractual relationship.

*Id.* (internal quotation marks and citation omitted).

7

¶14    We further determined that State Farm's questions were "material" within the meaning of the concealment clause, in that the questions "concern[ed] a subject relevant and germane to the insurer's investigation as it was then proceeding."    *Id.* at 469 (internal quotation marks and citation omitted). Specifically, Walker was asked about his name change and financial position.  We determined that "Walker's previous name could have helped State Farm in its arson investigation," and that "questions about Walker's financial position were relevant to Walker's possible motives for committing arson."  *Id.*  Thus, Walker breached the concealment clause by "intentionally conceal[ing] or misrepresent[ing] … material fact[s] or circumstance[s] relating to his insurance." *Id.* at 466.  As a result, Walker was not entitled to coverage under the policy.

¶15    Before addressing Link's arguments seeking to distinguish *Walker*, we note that *Walker* broadly considered the contractual ramifications of an insured's invoking his Fifth Amendment privilege.    *Walker*'s conclusion—that "[c]onstitutional immunity has no application to a private examination arising out of a contractual relationship"—did not depend on the language of the concealment clause but on the scope of Fifth Amendment privilege.  *Id.* at 468.  Accordingly, *Walker* applies with equal force to evaluating a potential breach of the cooperation clause.  Thus, in this section, we address Link's arguments concerning *Walker* as they relate to both of these contractual duties.

¶16    Link argues that *Walker* does not control because that case involved an insurer's investigation of a first-party claim (i.e., a claim for indemnification for the insured's own loss, as opposed to a claim for defense and indemnity resulting from a third-party suit against the insured).  However, *Walker*'s analysis was in no way dependent on whether it was the insured or a third party who suffered the loss for which the insured sought coverage.  Rather, *Walker* considered the general

question of whether collateral civil consequences may attach to the invocation of privilege in a coverage dispute. *See id.* at 468.

¶17    *Walker* considered this question in the context of a claim following an insured's own loss—fire damage to the insured's property—because that was the claim at issue. Logically, we discern no reason why the *Walker* rule should not apply when the insurance coverage claim giving rise to the contractual obligations derives from the insured's liability for a loss suffered by a third party. The insured's contractual obligation to assist with the investigation remains the same. And notably, Link provides no authority for his assumption that the type of insurance claim is dispositive or even relevant to analyzing an insured's breach of contract, whereas Midwest points to a body of persuasive authority applying the principles of *Walker* to third-party claims for defense and indemnity. *See, e.g.*, *Estate of Hott v. Augusta Mut. Ins. Co.*, 335 F. Supp. 2d 727, 730-32 (W.D. Va. 2004) (defendant in a wrongful death action who invoked Fifth Amendment privilege to avoid answering material questions was not entitled to coverage; an insured "may not rely on the Fifth Amendment to avoid a contractual obligation" (internal quotation marks and quoted source omitted)); *Anderson v. Southern Guar. Ins. Co. of Ga.*, 508 S.E.2d 726, 731-32 (Ga. Ct. App. 1998) (in a suit against the insured alleging various intentional torts, the insured could not "wield her Fifth Amendment privilege as a shield and a sword by demanding coverage and a defense under the insurance contract, while at the same time refusing to answer questions material to determining [her insurer's] duties under the contract").

¶18    Link further argues that *Walker* does not control here because in *Walker*, the insurer's questioning occurred during the investigative stage, prior to any lawsuit. Link contends that, in contrast, "[h]is obligation to respond [to Midwest's discovery requests] was based not on the insurance contract, but on

9

discovery statutes" providing for "specific statutory sanctions." *See* WIS. STAT. § 804.12 (providing for discovery sanctions). Link also contends that Midwest could have availed itself of an adverse-inference instruction as a result of Link's invocation of the Fifth Amendment. *See **Grognet v. Fox Valley Trucking Serv.***, 45 Wis. 2d 235, 239, 172 N.W.2d 812 (1969) ("[I]n a civil case as distinguished from a criminal case, an inference of guilt or against the interest of the witness may be drawn from his invoking the fifth amendment."). In other words, Link appears to argue that once adversarial proceedings had begun, Midwest's remedies for his discovery noncompliance were limited either to those under § 804.12 (which remedies, Link suggests, do not include contractual avoidance) or to an adverse-inference instruction.

¶19 We disagree. Link offers no compelling rationale for why the nature or source of his contractual obligations, or the relief available to his insurer, would be different in a coverage proceeding, as compared to an insurer's handling of claims outside of a lawsuit. As to the issue of relief specifically, Link is correct that Midwest may have had separate "legal remed[ies] available to it upon [his] invocation of Fifth Amendment privilege." But Link provides no legal support for the assumption that, in the face of a material breach of a policy provision, Midwest was not permitted to simply seek a declaration that it had no coverage obligation. Under the plain terms of the policy, coverage is contingent on Link's fulfilling his contractual duties, including that he cooperate with Midwest's investigation and defense of Plaintiffs' claims and that he not intentionally conceal or misrepresent any material fact upon which Midwest must rely as part of that process. Link's failure to carry out the terms of his contract did not require Midwest to pursue any "legal remedy" other than the one it chose. Thus, Link does not meaningfully explain why the availability of other remedies under rules of civil procedure might

operate to preclude Midwest from denying coverage on grounds that Link breached the policy.

¶20    We conclude that *Walker* controls and that the threat or possibility of parallel criminal charges did not relieve Link of his contractual duties under the policy. We now consider whether, as a matter of law, Midwest showed that Link breached the concealment and cooperation clauses. As part of this analysis, we address Link's additional arguments as to why he is entitled to coverage.

*II. Link Breached the Concealment and Cooperation Clauses*

A. Concealment clause

¶21    The policy's concealment clause states that Midwest "do[es] not provide coverage to an 'insured' who, whether before or after a loss, has … [c]oncealed or misrepresented any fact upon which we rely, if the concealment or misrepresentation is material and is made with intent to deceive." Link acknowledges that he intentionally concealed information, insofar as he chose not to answer any discovery requests. Link implies, however, that any fact he concealed through his discovery noncompliance was not "material."

¶22    We disagree. Having reviewed Midwest's discovery requests, we conclude that the information sought is directly and patently "germane to [Midwest's] investigation as it was then proceeding." *See Walker*, 157 Wis. 2d at 469 (internal quotation marks and citation omitted). That is, the discovery requests seek basic information about Link's posting photographs of and commentary about Plaintiffs on an adult website—information that must necessarily be relevant to determining coverage under the policy.

11

¶23    For example, the policy's personal injury endorsement excludes coverage for injury caused by the publication of material that the insured knew was false. Link, however, refused to answer any questions pertaining to his knowledge or state of mind in posting any material. Another exclusion denies coverage where the first publication occurred before the beginning of the policy period. Again, Link refused to provide information about when he made any of the posts. As demonstrated in *Walker*, the "materiality" requirement is not a high bar. *See id.* (questions about insured's name change and financial position relevant to arson investigation). We conclude that this bar was met here. And, like the *Walker* court, we reach this conclusion as a matter of law because, despite Link's implication, there is no genuine dispute of fact as to whether Midwest's questions are material. *See* WIS. STAT. § 802.08(2).

¶24    Link further argues that Midwest cannot deny coverage because it did not establish that his discovery noncompliance was prejudicial.[8] An insurer must indeed establish prejudice in denying coverage based on *noncooperation*. *See Ansul, Inc. v. Employers Ins. Co. of Wausau*, 2012 WI App 135, ¶¶29, 32, 345 Wis. 2d 373, 826 N.W.2d 110 (for coverage to be denied, the insurer must show that the insured's breach of the cooperation clause was material and prejudicial). But to the extent Link argues that an insurer must show prejudice in proving intentional *concealment*—separate and apart from the above-discussed requirement of materiality—he presents no authority for that proposition, nor does case law support

---

[8] Link also appears to argue that Midwest was required to show how his discovery noncompliance prejudiced merits/liability counsel in defending him against Plaintiffs' claims. Link does not explain why his discovery noncompliance in the coverage proceeding had to relate to the underlying lawsuit. Nor does Link provide any authority for the premise that an insured may choose not to participate in discovery on coverage so long as his underlying defense is not prejudiced. We therefore reject this argument without addressing it further. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (we do not address arguments that are undeveloped or unsupported by legal authority).

it. Thus, in *Walker*, 157 Wis. 2d at 467-69, we affirmed the denial of coverage based on the insured's concealment, without discussing prejudice. *See also **General Star Indem. Co. v. Bankruptcy Est. of Lake Geneva Sugar Shack, Inc.***, 215 Wis. 2d 104, 116-17, 572 N.W.2d 881 (Ct. App. 1997) (not discussing prejudice in setting forth the elements of the insurer's misrepresentation defense to the insured's business interruption claim); *cf. **Tempelis v. Aetna Cas. & Sur. Co.***, 164 Wis. 2d 17, 27, 473 N.W.2d 549 (Ct. App. 1991) ("reliance is not an element required to establish material misrepresentations in a proof of loss"; however, the insurer "must still establish that the misrepresentation was material").[9]

¶25    Accordingly, we conclude that Link's breach of the concealment clause was grounds for coverage denial, and we turn to the policy's cooperation clause.

B. Cooperation clause

¶26    Under the policy's cooperation clause, Link's duty "[in] the event of a covered offense" is that he "[c]ooperate with [Midwest] in the investigation, settlement or defense of any claim or suit." Midwest has "no duty to provide coverage under this policy if [Link's] failure to comply with [the duty to cooperate] is prejudicial to" Midwest.

¶27    Link raises several arguments as to why he did in fact cooperate with Midwest or, alternatively, why his lack of cooperation should not constitute a breach

---

[9] We note that even if Midwest needed to show prejudice in order to deny coverage on concealment grounds, it has made this showing. We discuss prejudice further in the next section, concerning Link's breach of the cooperation clause, and that analysis applies equally to Link's breach of the concealment clause.

of the cooperation clause.[10]   First, he implies that he did not breach the policy because he cooperated with merits/liability counsel in Plaintiffs' lawsuit.  This argument is a nonstarter.  Preliminarily, we note that the record is silent on whether or to what extent Link cooperated with merits counsel, a point Link himself acknowledges.  But even assuming that Link cooperated in the merits case, this was not his only contractual duty.  Link's policy requires his cooperation with "us," i.e., *Midwest*, in the "investigation, settlement or defense of any claim or suit," meaning Link was required to cooperate with Midwest in its coverage investigation.  Link cannot reasonably argue that he fulfilled this duty by participating in his own defense.

¶28   Along similar lines, Link implies that Midwest cannot use his discovery noncompliance as the basis for denying coverage because he was in a "Catch-22."   That is, Link argues, any admission of fault in the coverage dispute would have harmed his defense in the underlying lawsuit and may have represented a breach of other policy provisions requiring his cooperation with merits/liability counsel.  This argument ignores the fact that Link himself demanded defense and indemnification under his policy.  Having invoked the policy, Link was required to abide by its terms, including that he cooperate with coverage counsel and truthfully represent all material facts in the coverage dispute.  Link does not explain why fulfilling these duties in the coverage cross-claim would have interfered with his defense on the merits or breached his duty of cooperation with respect to merits/liability counsel.  And, as Midwest notes, if Link believed that fulfilling these

---

[10]  These arguments are not always clear, but we construe them as relating primarily to the cooperation clause and not the concealment clause, and so we address them here.  To the extent these arguments relate to the concealment clause, we reject them in that context as well.

duties ultimately would have harmed his defense, he could have foregone a defense paid for by his insurer.

¶29    Relatedly, we reject Link's argument that Midwest "arbitrarily decided what facts and what form of a response constitute cooperation." Rather, Midwest has merely attempted to follow a well-established procedural path available to insurers defending under a reservation of rights, in which the free exchange of information or discovery is a prerequisite to determining coverage. *See Choinsky v. Employers Ins. Co. of Wausau*, 2020 WI 13, ¶¶14-18, 390 Wis. 2d 209, 938 N.W.2d 548.

¶30    On a side note, we disagree with Link's assertion that "nothing in the policy forbids—or even advises him—that invoking his Fifth Amendment privilege during adversarial coverage litigation would be deemed a breach of the … cooperation provision[]." Link's policy expressly requires him to "[c]ooperate with [Midwest] in the investigation … of any claim or suit." We conclude that, as a matter of law, this clause puts the insured on notice that the insured must respond to discovery requests in the coverage proceeding. Midwest had no obligation to enumerate all of the potential consequences for failing to follow that requirement.

¶31    Link also argues that it would be against public policy to potentially harm "innocent third part[ies]"—here, Plaintiffs—by "[n]ullifying insurance coverage due to [his] alleged failure to cooperate." But "'[p]ublic policy' is no magic touchstone," and Wisconsin "has more than one public policy." *Cieslewicz v. Mutual Serv. Cas. Ins. Co.*, 84 Wis. 2d 91, 103, 276 N.W.2d 595 (1978).

¶32    Public policy, for example, favors the enforcement of contracts: an insurer's coverage obligations are dependent on the insured's fulfilling his or her

15

own contractual duties.  *See id.*  Another principle strongly at play here is the concept of "fortuitousness," which itself reflects several important public policy considerations:

> [I]nsurance covers fortuitous losses and [particular] losses are not fortuitous if the damage is intentionally caused by the insured.  Even where the insurance policy contains no language expressly stating the principle of fortuitousness, courts read this principle into the insurance policy to further specific public policy objectives including (1) avoiding profit from wrongdoing; (2) deterring crime; (3) avoiding fraud against insurers; and (4) maintaining coverage of a scope consistent with the reasonable expectations of the contracting parties on matters as to which no intention or expectation was expressed.

*Hedtcke v. Sentry Ins. Co.*, 109 Wis. 2d 461, 483-84, 326 N.W.2d 727 (1982).  As a corollary to these principles, it makes little sense to require most insureds to cooperate in the typical coverage investigation while allowing those accused of more egregious, and potentially criminal, acts to invoke privilege and still receive coverage.  As demonstrated by *Walker*, the decision to invoke the Fifth Amendment does not have to be—and sometimes should not be—consequence-free.

¶33    Link next argues that his failure to cooperate was not prejudicial to Midwest, as is required for coverage denial under the policy.  Midwest counters that without Link's discovery responses, it has been wholly unable to "evaluate whether there is actually any coverage available."  In such case, Midwest argues, prejudice is "self-evident," in that "Link has refused to provide *any* information" that it might use to determine whether any policy exclusions apply.  Midwest notes that there are several potentially applicable policy exclusions, but these "hinge upon Link's knowledge or intent"—information in Link's "sole possession."  Thus, Midwest contends, it has been wholly stymied, at the outset, from evaluating coverage.

16

¶34   We agree with Midwest that, without Link's discovery responses, Midwest was prejudiced in its ability to evaluate coverage.  That is, in the face of Link's noncooperation, there was no obvious or reasonable way for Midwest to determine if the policy covered any of Plaintiffs' claims.  These claims center on whether, when, and what Link posted about Plaintiffs and his state of mind in doing so.   Thus, Midwest's coverage determination rests on information that Link possesses and can provide.  Notably, Link does not meaningfully explain—and we cannot discern—what alternative procedure Midwest could have used to collect the necessary information to assess coverage.

¶35   Link further argues that Midwest was required to specifically detail why his discovery noncompliance precluded Midwest from determining coverage for each of Plaintiffs' claims, with reference to the three-part inquiry for evaluating coverage.  *See **American Fam. Mut. Ins. Co. v. American Girl, Inc.***, 2004 WI 2, ¶24, 268 Wis. 2d 16, 673 N.W.2d 65 (to determine if the policy covers the claim, we examine the policy's initial grant of coverage, its various exclusions, and the exceptions to those exclusions).  But Link provides no authority for his assumption that Midwest had to present a claim-by-claim analysis in order to establish prejudice.  Nor is it logical that Midwest would have to provide any greater specificity than that provided in its summary judgment briefing, where its argument rested on its manifest inability to make *any* coverage evaluations.  We agree with Midwest that adopting Link's position would allow him to use his Fifth Amendment privilege "as both a sword and a shield," in that coverage could never be determined so long as he continued to invoke privilege.

¶36   In sum, because Link failed to comply with the policy's cooperation clause, Midwest was not required to provide coverage under the policy.

**CONCLUSION**

¶37 Based on the undisputed material facts, we conclude that Link breached the policy and that Midwest therefore has no duty to defend or indemnify him in Plaintiffs' suits. Accordingly, the circuit courts properly granted Midwest's motions for summary judgment on Midwest's cross-claims for declaratory judgment.

*By the Court.*—Orders affirmed.